**John Allen RUBIO, Appellant,**

v.

**The STATE of Texas.**

**No. AP–74852.**

Court of Criminal Appeals of Texas.

Sept. 12, 2007.

Rehearing Denied Dec. 5, 2007.

**2**

Alfredo Padilla, Brownsville, for Appellant.

Rene B. Gonzalez, Asst. C.A., Brownsville, Matthew Paul, State's Attorney, Austin, for State.

WOMACK, J., delivered the opinion of the Court, in which PRICE, JOHNSON, HOLCOMB, and COCHRAN, JJ., joined.

The appellant was indicted on four counts of capital murder[1] related to the killing and decapitation of his three children: Julissa Quesada (age 3), John E. Rubio (age 14 months), and Mary Jane Rubio (age 2 months). The appellant pleaded not guilty by reason of insanity[2] to all four counts. The jury found the appellant guilty, and rendered a verdict on the issue of punishment that required the trial court to sentence the appellant to death.[3] In the appeal to this court, required by statute,[4] the appellant raises twelve points of error. We will reverse.

## I. Did the trial court err by admitting Camacho's statements?

In his first point of error, the appellant argues the trial court erred during the guilt-innocence phase of the trial by admitting the statements of Maria Angela Camacho, the appellant's common-law wife and alleged accomplice in the murders for which he was being tried. Camacho invoked her Fifth Amendment right to not testify in open court, and the state offered three statements she made to the police regarding the murders, two written statements and one oral statement recorded on videotape. Over the appellant's objection, the trial court admitted all three statements. The written statements were read to the jury by the Brownsville Police Department detectives who originally took the statements. The videotaped statement was played for the jury, who also received a written transcript. The appellant was never able to cross-examine Camacho, either at the time she made the statements or during the trial.

At the time of the appellant's trial, the admissibility of out-of-court statements against a defendant where the declarant was unavailable for cross-examination was governed by *Ohio v. Roberts*.[5] Under *Roberts*, such a statement was admissible so long as it bore adequate "indicia of reliability" or otherwise fell within a "firmly rooted hearsay exception."[6]

Since the time of the appellant's trial, however, the Supreme Court overruled *Roberts* by announcing its opinion in *Crawford v. Washington*.[7] Under *Crawford*, non-testimonial hearsay evidence would still be admissible under a scheme like that in *Roberts*, but the Court made clear that, "Where testimonial evidence is at issue, ... the Sixth Amendment demands what

---

**1.** See PENAL CODE § 19.03(a)(8).

**2.** See CODE CRIM. PROC. art. 46.03 §§ 1–3, repealed by Acts 2005, 79th Leg., ch. 831, § 1.

**3.** See CODE CRIM. PROC. art. 37.071, § 2(b), (e), (g).

**4.** Id., § 2(h).

**5.** 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

**6.** Id., at 66, 100 S.Ct. 2531.

**7.** 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

the common law required: unavailability and prior opportunity for cross-examination."[8] Although the Court declined to define specifically what is encompassed by the term "testimonial," they did say that at a minimum it includes "police interrogations," because they are one of "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed."[9]

The trial court in this case held Camacho's statements to be sufficiently reliable, and so they were admitted. The State does not dispute that Camacho's statements were given during a police interrogation and therefore testimonial in nature. The State also acknowledges that Camacho had invoked her Fifth Amendment right at trial and was therefore unavailable to testify. The State does not concede that the trial court erred in admitting Camacho's statements under the law in effect at the time. But the State does concede the Supreme Court's holding that new rules of criminal procedure are to be "applied retroactively to all cases, state or federal, pending on direct review or not yet final,"[10] and that *Crawford* came into effect while the appellant's case was pending on direct appeal.

Accordingly, we hold that the trial court erred in admitting Camacho's statements. We will now turn to the issue of prejudice.

## II. Did the trial court's error prejudice the appellant's case?

■ The erroneous admission of Camacho's statements does not automatically merit reversal. Rather, any Confrontation Clause violation, once proven, is subject to harmless error analysis.[11] In other words, this Court will reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the appellant's conviction.[12] If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt.[13]

■ An appellate court should not focus on the propriety of the outcome of the trial.[14] Instead, we calculate the probable impact of the error on the jury, in light of all other evidence available.[15] Evidence of the defendant's guilt should be considered, but that is only one factor in the analysis.[16] The question, ultimately, is whether the State has proven beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.[17]

In the instant case, the appellant pleaded not guilty by reason of insanity to all four counts in the capital murder indictment. He did not contest that he commit-

8.  *Id.*, at 68, 124 S.Ct. 1354.

9.  *Ibid.*

10. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

11. *Crawford*, 541 U.S., at 76, 124 S.Ct. 1354 (Rehnquist, C.J., concurring); *See also, Lilly v. Virginia*, 527 U.S. 116, 140, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

12. R.App. Proc. 44.2(a); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

13. *Satterwhite v. Texas*, 486, U.S. 249, 256–57, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Wes-brook v. State*, 29 S.W.3d 103, 119 (Tex.Cr. App.2000).

14. *Wesbrook*, 29 S.W.3d, at 119.

15. *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Cr.App.1989).

16. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Cr.App.2002).

17. *Satterwhite*, 486 U.S., at 258–59, 108 S.Ct. 1792 (quoting *Chapman*, 386 U.S., at 24, 87 S.Ct. 824).

ted the acts which killed the children. Therefore, the only real issue in contention at the guilt-innocence phase was the appellant's state of mind. The primary evidence relevant to that issue came in the form of statements the appellant and Camacho made to the police. We will now turn to those.

### The Appellant's Statement

In his own videotaped statement to the police, which was also admitted at trial, the appellant freely admitted to having killed his children.

The appellant said he met Camacho when they were living in the same apartment complex in 2000 or 2001. He used to inhale spray paint with Camacho's then-live-in boyfriend and, after seeing her physically abused by him, she and the appellant became romantically involved. Camacho eventually left her former boyfriend and moved in with the appellant.

Camacho brought her child Julissa with her, who at the time was less than a year old. Camacho was also pregnant with John, who was born eight or nine months later. Although it was unclear who John's father was, the appellant and Camacho decided to name John after the appellant and give him the appellant's surname. Shortly after John was born, Camacho became pregnant again, and gave birth to Mary Jane in January of 2003.

During this time the appellant held a number of low-wage retail jobs, and the family moved several times, including time spent in friends' houses and sometimes living on the streets. Eventually they moved into a home they shared with the appellant's mother and one other person.

The appellant said Child Protective Services took custody of Julissa and John at one point during this time, after finding the appellant was abusing spray paint in front of the children. This incident inspired him to find a job so he could get the children back, because he "adored" them and "would do anything for" them. CPS returned the children after three or four months—after the appellant got a job—but continued to visit the home to check on the children and to test the appellant for illegal drug use. Those tests, the appellant claimed, never yielded a positive result for illegal drugs.

The appellant said CPS stopped making home visits after he got a job at Golden Corral. He lost this job in December of 2002, a month before Mary Jane was born. During that time, in order to make money to pay rent and provide for the children, the appellant did some odd jobs but also prostituted himself. He learned how to be a prostitute from his mother, who had encouraged him to do so.

With the money the appellant made through prostitution, he was able to pay the rent when it came due on January 11th and February 11th of 2003, but he did not have enough money for the March 11th payment. He had $175 in a wallet, but it was stolen from his house. He asked his brother if the family could move into his brother's house, but his brother refused. He asked his brother's girlfriend Beva to loan him the money, but she too refused. Around this time, the family found out the food stamp benefits for the children were being cut off because of a problem with the children's paperwork. Because of the various money problems the family was experiencing, the appellant decided to take the children to a local homeless shelter. This was the day before the children were murdered.

That same evening, the appellant's mother came to the front door of the house. The appellant had recently thrown his mother out of the house because she had not paid her share of the rent. The

appellant let his mother inside the house because she was now acting very nicely towards him, but once inside, she began to act strangely. She was pacing back and forth, alternatively smiling at him and acting angry towards him, and talking to herself. She left after less than an hour. Shortly after that, the appellant heard another knock at the door. This time it was Lorena, a male transvestite prostitute who was the other tenant in the house with the appellant and his family. Lorena was with a friend. They stayed approximately twenty minutes, talking amongst themselves, then left. It was now close to midnight.

Camacho and the children were still awake, watching television in the bedroom. Because the appellant's head was hurting, he turned off the television and turned on the radio to listen to Christian music in order to distract himself. He and the children began to fall asleep, but Camacho woke him up. He then put John into the crib, while the two girls remained sleeping on the bed.

The appellant returned to lay down on the bed and listen to music. As he lay there, he said he suddenly felt weird, as if something bad was going to happen. He began to hear strange, scary noises, and he saw mice running around on the floor, which he had never before seen in that house. He then heard his hamsters fighting with each other, which was also unusual. He kept five to seven hamsters as pets in a cage near his bed. He described what he saw next as being "like a movie, or something I saw on TV." The hamsters would look at him with a nasty expression and then growl. He said this had happened only rarely before, and only when his mother or Lorena were at the house.

The appellant then decided to kill the hamsters, which he did by spraying them with hairspray so they would choke. He brought the cage into the front room of the house. Some were still alive, so he put bleach on them, and then took them out one at a time and smashed their heads with a hammer. He then flushed them down the toilet.

Julissa, hearing the appellant killing the hamsters, awoke and came into the front room. She then started to act strangely:

[The appellant]: And she started talking in like, demonized—like, she was looking at me, like, weird.

[Police detective]: Give me an example of what she was saying.

A: Like (descriptive sound). She was, like, acting weird, like—I don't know. I can't do it like she did.

Q: She was only making sounds; she wasn't saying anything?

A: She was making sounds, and then she was, like—and she doesn't know English. I was, like (speaking Spanish).

Q: Who were you talking to?

A: To her. She was two people in one.

Camacho had awoken by this point and was watching the scene herself. The appellant asked Julissa who she was, because she was acting like someone else, and she told the appellant she was his grandmother. He began to speak with Julissa as if she was his grandmother, and Julissa would respond:

[The appellant]: ... so I asked her, "Is it you, Grandma?" She said, "Yes." "What did you do with my daughter?" She goes, "She's right there," like she was inside my other girl, like Mary Jane. I said, "What do you mean? That's Mary Jane, that's not you." "No." I said to her, like, she was trying to give me—like tell me, but she couldn't say it, like, "Yo es ella, y ella es yo."

[Police detective]: What she was trying to tell you, was that she was—

A: She was in her body—

Q: That your grandmother was in Julissa's body?

A: Yes.

Q: And Julissa's body was in—

A: In Mary Jane's body.

Q:—Mary Jane's body?

A: Uh-huh.

The appellant seemed to resign himself to the fact that his grandmother was possessing his daughter's body, although it was "a little weird." He went into the kitchen to make something to eat, but he started to feel woozy, so he went back into the front room. He then saw Julissa cutting the tape off of an electrical outlet, which the appellant had put over the outlet to prevent the children from hurting themselves. He said it appeared to him that Julissa was cutting the tape with a pair of scissors, and then trying to give the scissors to John so that he could stick them in the outlet and electrocute himself. The appellant had taken John out of his crib at some point earlier.

The appellant said he believed his grandmother's spirit, possessing Julissa's body, was attempting to harm John. He shook Julissa and blew in her face, in an attempt to cast the grandmother out. He then put John back in his crib and began to choke Julissa. He thought he had succeeded in casting out the grandmother's spirit, but in fact Julissa either passed out or died because the appellant was choking her. He then called to her and she revived, but began to say that she wanted to harm the children, to make them and him suffer.

Camacho had entered the room at some point while the appellant was choking Ju-

lissa. After Julissa revived and spoke, the appellant asked Camacho to hold Julissa down while he choked her. He said Camacho did so, but that Julissa "didn't want to die." He then told Camacho to go to the kitchen and bring him a knife, which she did, returning with two knives. The appellant then stabbed Julissa several times in the chest. He then turned her over and stabbed her in the back of the head because he wanted to remove her brain. He said Camacho was holding down Julissa's feet and legs but turning her head away to avoid seeing what was happening. Over the next five to ten minutes, the appellant cut off Julissa's head with the kitchen knife. He said Julissa's lips were still moving and talking, and this scared him so he separated the head from the body. He eventually put Julissa's body in the kitchen sink so he could wash it.

The appellant then noticed Mary Jane looking at him, and he said to Camacho, "She's next because she's also possessed, they're—all three together." He then choked Mary Jane, and she seemed to die more easily, but she then revived just as Julissa had. Mary Jane began to laugh, and he started laughing with her, which suggested to him that something was wrong. He then decided to decapitate Mary Jane as well. After doing so, he brought her body into the kitchen, where he proceeded to "cleanse" the girls' bodies by pouring water into their throats where they had been cut.[18]

*Camacho's Statements*

Camacho made three statements to the police, two written and one videotaped, that were all offered and admitted by the State during its case-in-chief at the guilt-

18. There was presumably more of the video statement to be shown (i.e., describing John's murder), but there was apparently a dispute over the transcription/translation and ulti-

mately the jury only saw the video up to this point. *See* Reporter's Record Vols. 22: 278; 23:3–7.

innocence phase. As noted above, Camacho invoked her Fifth Amendment rights and was thus unavailable for cross-examination.

Camacho gave the first statement on the evening of March 11, 2003, the same day as the murders. It was read to the jury by Detective Chris Ortiz of the Brownsville Police Department, the same person to whom the statement was made. Her statement largely corroborated the appellant's, although it gave more background information than the appellant's. For example, she told of how the children had been sick with fever for the three days leading up to the murders. She said the day before the murders, a woman they saw while riding the bus gave John a piece of candy. The appellant believed the woman cast a spell on the children, causing them to be sick. When they returned home, the appellant had her break an egg in a glass of water, and the way in which the egg yolk floated told them that someone had done something bad to Julissa. She also mentioned the appellant's mother coming to the house that night, and the appellant and his mother discussing using the powers of witchcraft to help the children.

There was some inconsistency between the appellant's statement and Camacho's, however. For instance, Camacho said the appellant claimed to see possession in both girls simultaneously, and he strangled both girls simultaneously while she held them down. Camacho said, "Mary Jane started staring right at my eyes, real bad, like with anger, and evil at the same time." Camacho also said the appellant killed Mary Jane first, then Julissa, and he did so only by cutting off their heads—she did not mention him stabbing Julissa first. She then tells of killing John in the same manner.

Camacho then said after all three children were killed, she and the appellant took a shower together. The appellant told her he was dying, and so they should make love for the last time, which they did. Afterwards, he told her again he was dying, after which she tried to cut her wrist because she did not want to live without her husband and children. The appellant gradually started to feel better, and so Camacho told him she wanted to bury the children. They gathered the children's bodies, along with the knife they used, into a trash bag for that purpose.

Shortly afterwards, the appellant's brother showed up at the house, discovered what had happened, and called the police. Camacho said when Detective Ortiz asked her at the scene why the floor of her apartment was wet, she told him, "I cleaned the floor before and after we killed the babies." When Ortiz asked her why the door off the kitchen to the outside had been nailed shut, she said the appellant had done so before killing the children "because we didn't want anyone or any bad spirits to come in through that door."

Camacho gave her second statement the following morning, on March 12th, to Detective Thomas Clipper of the Brownsville Police Department, who read it to the jury at trial. In that statement, Camacho said she wanted to tell the detectives the "real reason" her children were killed. She said specifically,

> I would like to start saying that yesterday I told the detectives that witchcraft was the reason that John and I killed our children. That was not true. The reason that we decided to kill the children was because of money problems.

Camacho then told of how the family had been having financial difficulties, particularly in paying the rent. Consistent with the appellant's statement, she said the day before the murders, they received notice that the family's food stamp benefits were about to end because Julissa's social

security number did not match up with her birth certificate. By the morning of March 11th, with no money for food or clothing for the three children, and upon learning they would not be able to stay with the appellant's brother in the event they were evicted from their apartment, Camacho and the appellant discussed the situation and decided it would be "better for the children to die than to suffer."

Her account of how they killed the children more or less matched up with that of the first statement, except that Camacho said she witnessed the appellant kill the hamsters as well. She said that when the appellant told her he wanted to cut the children's heads off, she asked him why. He replied, "Because . . . we had no money. No way to take care of them. It is better that they go with God." She said again that they killed the girls first, and about two hours later they decided to kill John because they did not want him to suffer alone.

Camacho gave her third statement to Detective Sam Lucio (along with Clipper), on the evening of March 13th. The statement was videotaped, and the tape was played for the jury at trial. The jury also received a transcript of the tape to refer to as they watched. In the third statement, Camacho gave more background on her life and how she and the appellant met, and her story more or less matches with his. She again told of the money problems they were having in the days leading up to the murders, but when asked directly if the appellant had prostituted himself for money during that time she replied, "No."

The detective asked Camacho about the two conflicting prior statements she had given about the murders and asked that she now give a true account. Camacho's answer incorporated both prior motives given. She repeated the story about their difficulties with the rent money just before the murders, and she added that the children were suffering because, among other things, the apartment they lived in apparently had no water or electrical service. Yet she also said the night before the murders, she and the appellant felt "strange" and "weird." She said the appellant killed the hamsters the next morning "because we thought they were bringing evil" and it was contributing to the children's suffering. She again said the appellant nailed the kitchen door shut in order to ward off "bad spirits."

Overall, Camacho spoke often in the third statement of the children's suffering, but it is unclear if she meant they suffered because of the family's financial problems or because they were possessed, as she and the appellant seemed to believe they were:

[The Detective]: Were the children hungry?

[Camacho]: I would give them milk. To Julissa, I would ask her, and she would say that she was not hungry, that she was not hungry. She was unable to talk. She could not talk. She would just do like this, but she would not say anything. She couldn't say anything.

Q: And then what happened?

A: What happened? We decided the best thing to do would be to do what we did, because I would see that the children were suffering a lot.

Q: So they would not suffer?

A: Uh-huh.

Q: What type of suffering were the children having?

A: They could not sleep. They would wake up and they would be scared.

Q: Only that night?

A: No. They had been like that for a while.

Q: Was that the first night that things were weird?

A: The first night that things were weird, but there were some days in which the children were like that.

Q: But this is the first time that you thought that there was something strange?

A: Yes.

Q: And that's why he killed the hamsters. And then you said that in order for the children not to suffer—was it your idea or his idea?

A: Both of us.

Q: Both of you?

A: Uh-huh.

Q: Were you talking about it?

A: Yes.

Camacho's account in the third statement of how the children were killed largely matches the other two. She says she did not see the appellant stab Julissa, but also that she was looking away, and she does not deny that he stabbed her. She said that when they were discovered by the appellant's brother, the appellant told him, "that we didn't want to do it, that he didn't want to kill them, that he only wanted the children to be well." She also repeated the story about the interaction with the woman on the bus the day before.

One new detail that Camacho mentioned in the third statement was that she and the appellant planned to "go away" after they buried the children. When asked about it, her answers were the last portion of the statement:

[Police Sergeant]: You said that you were going to go away. Why is it that you said you were going to go away?

[Camacho]: Because we were afraid. I didn't want to lose my husband again, since he had gone to jail before. I was afraid because I had never been in jail before.

Q: You felt like you were going to jail?

A: Yes, because we did something wrong.

Q: And your husband knew that he had done wrong?

A: Yes, we knew.

Q: Both of you knew that you had done wrong. What did you do that was wrong?

A: We did wrong in killing the children, in the way—in that way, with the government. I only thought that the children were not going to suffer anymore. That's the only thing I had in my mind. I didn't have in mind that we were going to jail until the end.

Q: Thank you.

### Analysis

■ Because Camacho was an accomplice to the murders, and both the appellant's common-law wife as well as the mother of the victims, any testimony she gave at trial was likely to be compelling. That does not foreclose our analysis, however. If the record shows, beyond a reasonable doubt, that Camacho's erroneously admitted statements did not contribute to the guilty verdict, then that constitutional error was harmless.

Here, because the appellant pleaded not guilty by reason of insanity, the primary issue to be resolved at trial was the appellant's state of mind when he committed the murders. That is, whether the appellant, at the time of the conduct charged, as a result of severe mental disease or defect, did not know that his conduct was wrong.[19] Of all the witnesses presented by the State, Camacho was in the best position by

19. PENAL CODE § 8.01.

far to refute the appellant's contention that he was insane. And her statements do precisely that—particularly the second statement, in which she plainly states that the reason they killed the children was not because of witchcraft, but because of money.

Even more troubling, of all the witnesses presented by the State, Camacho had the most incentive to be less than truthful, because she herself was directly involved in the children's murders. In fact, the original capital indictment named Camacho and the appellant as co-defendants, before their causes were later severed. The testimony of accomplices is discussed in *Crawford* as one of the "core testimonial statements that the Confrontation Clause plainly meant to exclude." [20] In this case, Camacho's statements directly refute the appellant's only real defense. Moreover, she made three statements to the police, all of which contradict each other to some extent. The lack of opportunity for the appellant to cross-examine her, therefore, had a devastating effect on his case.

The State, in its brief, contends the erroneously admitted statements were not so harmful, or at least not harmful enough to merit reversal. The State makes its argument in the context of *Shelby v. State*,[21] which describes a test for determining harm in Confrontation Clause cases. Although *Shelby* pre-dates *Crawford*, we will address the State's arguments in turn.

First, the State contends that Camacho's statement was relatively insignificant, in that it was far outweighed by the other evidence presented, particularly the appellant's own statement in which he admits killing the children. The State submits that, in light of the substantial evidence of the appellant's culpability, Camacho's statement was unnecessary to establish his guilt.

As stated above, however, the issue at trial was not really the appellant's responsibility for the children's deaths. The appellant freely admitted that he killed the children. Instead, the issue was whether the defendant was legally insane. His own statement supported a finding of insanity, in that he spoke extensively of demonic possession and "evil" in the children that caused him to commit the murders. Camacho's second statement directly contradicts that argument, by asserting that she and the appellant killed the children because of money problems. Worse, Camacho says in her third statement that the appellant "knew" that what he had done was "wrong," which directly refutes the legal definition of insanity. Given Camacho's unique position as both accomplice to the crime and direct witness to the appellant's motivations, her specific, detailed testimony obviously had great significance.

The State also dismisses the importance of Camacho's statement as being merely cumulative of other evidence, and corroborated by the appellant's own statement. Yet the record shows this to be true only as to the facts of the murders themselves, namely, the methods employed and the chronology. As to the more important issue—the appellant's motive—there are clear discrepancies between the appellant's statement and those of Camacho. And, even if Camacho's statement matches with the appellant's, that does not change the fact that Camacho herself was facing indictment for capital murder when she spoke with the police. Obviously then, she could have been under some pressure to modify her story, given her own partic-

**20.** *Crawford,* 541 U.S., at 63–4, 124 S.Ct. 1354.

**21.** 819 S.W.2d 544, 546–47 (Tex.Cr.App. 1991).

ipation in the murders. That is precisely the type of issue the appellant was not able to address on cross-examination.

The State further argues that Camacho's statement was of little importance because the appellant had admitted responsibility for the murders, and the substance of Camacho's statement was shown to be "accurate" by corroborating forensic and DNA evidence. Again, however, Camacho's statement can only be said to be accurate as to the grisly details of the murder itself. It cannot be said that her statement was "accurate" as to the appellant's motives because she gives at least two conflicting motives for the appellant's actions.

The State also argues that any harm caused by not cross-examining Camacho was cured at least in part by the opportunity to cross-examine other State's witnesses, such as the officers who interrogated Camacho and later read her statements to the jury. Even if this were true, it is clear under *Crawford* that the statements of accomplices are normally particularly harmful. And it is difficult to see how cross-examining the interrogating officers, who can only speculate as to Camacho's motives and influences to testify, would have anywhere near the same effect as cross-examining Camacho herself.

Finally, the State contends the prosecution's case was strong overall, even without Camacho's statements. Again, however, the State focuses on the evidence which proves the appellant's actual participation in the murders, such as his own statement and the physical evidence corroborating his and Camacho's accounts of the murders. That evidence is indeed overwhelming. Yet the crucial evidence to rebut the appellant's contention that he was not guilty by reason of insanity came almost exclusively from one source: Camacho's statements.

Camacho, who was not only at the scene but by her own admission was an accomplice, told the jury (as read by Clipper): "The reason that we decided to kill the children was because of money problems." Later, she told the jury (in her videotaped statement) that she and the appellant "knew" they had "done wrong." No physical evidence presented at trial could corroborate these statements. On the other hand, there were many factors that could have affected the statements' accuracy, including Camacho's own pending prosecution for her involvement in the murders, her state of mind due to the horrific acts in which she had just participated, and her mental competency, given that she was a high school dropout with at least some time spent in special education courses. It is obviously not for this court to say whether Camacho's statements were accurate or not. Yet we can say that her statements likely contributed to the jury's verdict of guilt, such that the error in admitting her statements at trial clearly prejudiced the appellant's case. We sustain point of error one.

*Conclusion*

Having sustained the appellant's first point of error, we need not address the other eleven. We reverse the verdict of guilt and remand this cause to the trial court.

KELLER, P.J., filed a dissenting opinion, in which KEASLER and HERVEY, JJ., joined.

MEYERS, J. dissented.

KELLER, P.J., dissenting in which KEASLER and HERVEY, JJ., joined.

I agree with the Court that error occurred in this case, but I do not agree with

the Court's harm analysis. If the jury could properly have found that Rubio was legally insane at the time he killed his children, then this would be a more difficult case. But as it turns out, this is not a difficult case. Even under Rubio's defensive theory, he was not legally insane.

It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.[1] The pertinent question in this case is what is meant by the requirement that a defendant know that his conduct is "wrong." It appears to be undisputed that Rubio knew that killing his children was legally wrong. In Texas, such knowledge is dispositive of the question of insanity: a person who knows that his conduct is illegal cannot take refuge in the insanity defense.[2]

We considered this issue, in a more common procedural context, in *Bigby v. State*.[3] Bigby was charged with murdering his friend Mike Trekell and Trekell's sixteen-month-old son. Bigby's statement to the police indicated that he had killed his friend under the (mistaken) belief that Trekell was conspiring against him. After shooting Trekell, Bigby suffocated the child and placed him face-down in a sink filled with water. Bigby said he did not know why he killed the child.

At trial, several expert witnesses testified that Bigby knew that his conduct was illegal, but they contended that he did not know the act was morally wrong. According to these experts, appellant believed that regardless of society's views about this illegal act and his understanding that it was illegal, under his "moral" code it was permissible. The jury found against Bigby on his insanity defense. In rejecting a claim on appeal that the evidence was factually insufficient to support this finding, we said:

> This focus upon appellant's morality is misplaced. The question of insanity should focus on whether a defendant understood the nature and quality of his action and whether it was an act he ought to do.... By accepting and acknowledging his action was "illegal" by societal standards, he understood that others believed his conduct was "wrong."[4]

Although the procedural posture in this case differs from that in *Bigby*, that case nevertheless stands for the proposition that the viability of the affirmative defense of insanity is gauged by the actor's knowledge that his conduct was illegal.[5]

This position is consistent with the origin of the *M'Naghten* rule, which is the basis of the insanity defense in Texas. In 1843, Daniel M'Naghten tried to kill England's Prime Minister, Sir Robert Peel, because M'Naghten believed, mistakenly, that Peel was conspiring against him.[6] In the attempt, M'Naghten instead shot and killed Peel's secretary, Edward Drummond.[7] M'Naghten was acquitted by rea-

---

1. Tex. Pen.Code § 8.01(a).

2. There is considerable evidence that paint-sniffing was the cause of whatever mental disorder Rubio might have. I do not find it necessary in this case to consider whether mental disorder caused by voluntary ingestion of dangerous substances is treated differently from mental disorder occasioned through no fault of the actor.

3. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim.App.1994).

4. *Id.* (citations omitted).

5. *See id.*

6. *See M'Naghten's Case*, 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843).

7. *See id.*

son of insanity, and a public uproar followed.[8] In response to this outcry, the House of Lords asked a panel of judges a series of questions about the law of insanity. The first question asked of the judges was:

> What is the law respecting alleged crimes committed by persons afflicted with insane delusion, in respect of one or more particular subjects or persons: as, for instance, where at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some supposed public benefit?[9]

Lord Chief Justice Tindal replied:

> [A]ssuming that your Lordship's inquiries are confined to those persons who labour under such partial delusions only, and are not in other respects insane, we are of the opinion that, notwithstanding the party accused did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable according to the nature of the crime committed, *if he knew at the time of committing such crime that he was acting contrary to law;* by which expression we understand your Lordships to mean the law of the land.[10]

This test excused from responsibility only those who had committed criminal acts while in extreme delusional states that caused them to misperceive the very nature of their acts, or to believe that in acting, they were obeying rather than violating the laws of society.[11]

> Because M'Naghten intended to shoot to kill, despite his paranoid delusions, *and never claimed he thought the law sanctioned his act,* he would not have been acquitted under the test named after him.[12]

Although Texas insanity law was initially derived from the *M'Naghten* test,[13] from 1974 to 1983 Texas used a different test, thought by some to be more appropriate.[14] But in 1983, public outrage over the John Hinckley verdict led the Texas legislature to consider returning to the *M'Naghten* test.[15] Opponents of the revisions argued that persons who were clearly insane and should not be held responsible for their actions would not meet the proposed "ov-

---

8. *See id.*

9. *See id.*

10. *See id.* (emphasis added).

11. *Mentally Ill Criminal Offenders and the Strict Liability Effect: Is There Hope for a Just Jurisprudence in an Era of Responsibility/Consequences Talk?*, 57 ARK. L.REV. 447, 480 (2004). This article carefully explains the issues raised by the subject of mentally ill offenders, but criticizes the M'Naghten test and decries what it terms "the persistent influence of primitive religious notions of good and evil" on the criminal law's treatment of mentally ill offenders. *Id.* at 509.

12. *Id.* at 467 (emphasis added).

13. Brian D. Shannon, Essay, *The Time is Right to Revise the Texas Insanity Defense: An Essay,* 39 TEX. TECH L.REV. 67, 71 (2006).

14. *Id.* at 72; Acts 1973, 63rd Leg., p. 883, ch. 399, § 1, eff. Jan. 1, 1974 (enacting TEX. PEN. CODE § 8.01(a))(actor insane if he "either did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated").

15. Shannon at 73; House Study Group ("HSG"), SB 7, bill analysis, p. 22 ("supporters say") (May 16, 1983).

erly narrow" test.[16]  As an example, they cited "the woman who killed her child 'to exorcise a devil.' "[17]  In spite of these concerns, Texas adopted a test that "could hardly be narrower."[18]

There has been some dispute in academic circles about the legal affect of *Bigby's* holding.  Discussing the Andrea Yates case, one commentator who was critical of the *M'Naghten* standard [19] contended that there was ambiguity in Texas about whether "wrong" should be considered from a legal or a moral standpoint.[20]  She argued that *Bigby* simply upheld "the jury's use of reasonable discretion in how it would view the word 'wrong' " and did not bind "future courts with a definition of 'legal wrong.' "[21] But any interpretation of *Bigby* that would allow for a different definition of "wrong" conflicts with the legislative history of the 1983 amendment to the definition of insanity.

Another commentator, who also criticized the use of the *M'Naghten* test, nevertheless described the law in Texas thus:

[A] mother whose religious delusions motivate her to drive out the devil by killing her children clearly suffers from severely impacted thought processes. "How could knowledge of right and wrong be more clearly displaced?"  Unfortunately, for purposes of the *M'Naghten* test, the fact that Andrea Yates realized the illegality of her act would be enough to find her sane.[22]

Justice Benjamin Cardozo, another critic of the *M'Naghten* test, gave the example of a devoted mother who kills her child under the insane delusion that God ordered her to do so.[23]  It seemed to Justice Cardozo "a mockery" to say that she knows the act is wrong and thus has no insanity defense.[24]  Yet this is the law in Texas and in many other states.[25]

Mental illness can indeed excuse criminal conduct, but only for a narrow range of offenders.  Given the evidence in this case, it seems clear to me that John Rubio is not within that range.  I conclude that he could not have carried his burden to establish that he was legally insane.  That being

16.  HSG, p. 23–24 ("opponents say").

17.  *Id.* at 24.

18.  Deborah W. Denno, *Who is Andrea Yates? A Short Story About Insanity*, 10 DUKE J. GENDER L. & POL'Y 1, 16 (2003) (quoting Elaine Cassel, *The Andrea Yates Verdict and Sentence: Did the Jury Do the Right Thing?*, FINDLAW'S WRIT, Mar. 18, 2002, http://writ.news.findlaw.com/cassel/20020318.html).

19.  *Id.* at 13–16.

20.  *Id.* at 16–17.

21.  *Id.* at 16 n. 139.

22.  Abigail Wong, *Filicide and Mothers Who Suffer from Postpartum Mental Disorders*, 10 MICH. ST. J. MED. & L. 571, 583 (2006) (citing Laura E. Reece, *Comment, Mothers Who Kill: Postpartum Disorders and Criminal Infanticide*, 38 UCLA L. REV. 699, 704 (1991)).

23.  *See People v. Schmidt*, 216 N.Y. 324, 339, 110 N.E. 945 (1915).

24.  *See id.*

25.  *See, e.g., Bigby v. State*, 892 S.W.2d 864 (Tex.Crim.App.1994); *State v. Hamann*, 285 N.W.2d 180, 183 (Iowa 1979) ("There is no practical distinction between moral and legal right or wrong in a murder case.  Under any rational legal system ever devised murder would be prohibited.  And under any rational moral system ever imagined murder would be reprehensible."); *State v. Crenshaw*, 27 Wash. App. 326, 338–39, 617 P.2d 1041 (1980) ("If the accused knew his act was wrong—either legally or morally—then he cannot be excused for his crime by the insanity defense.").  *But see, e.g., People v. Serravo*, 823 P.2d 128, 135 (Colo.1992).

so, the admission of Maria Camacho's statements was harmless error.