

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00447-CR

_____

ANTHONY REYNALDO MARTINEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1557561R

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Anthony Reynaldo Martinez of six counts of aggravated assault on a public servant while using a deadly weapon and one count of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2), (b)(2)(B). The jury assessed punishment for each count of aggravated assault on a public servant at eight years' confinement in the Institutional Division of the Texas Department of Criminal Justice. On the remaining count of aggravated assault, the jury assessed punishment at two years' confinement. The trial court imposed sentence in accordance with the jury's verdicts and ordered that the sentences were to run concurrently.

On appeal, Appellant raises two points, both claiming that the trial court erred by admitting evidence that deprived him of his Sixth Amendment right to confrontation. The admission of neither statement violated Appellant's right to confrontation. Beyond a reasonable doubt, the statement he references in his second point was not a contributing factor in the sentence assessed by the jury. Thus, even if the trial court erred by admitting the complained-of statement into evidence, that error was harmless.

We affirm.

## II. Factual background

The guilt/innocence phase began with testimony that in response to a 911 call made by Appellant's father (Father), a police officer was dispatched to make a welfare check at an apartment. Father suggested that there was a "situation [that could] be detrimental to someone" in the apartment. The officer did not make contact with the apartment's occupants.

The next day, police received another 911 call involving the same apartment's residents; a recording of the call was played for the jury. This call came from Appellant's brother-in-law (the Caller) who stated that he had just received a call from Appellant and Appellant's girlfriend (Girlfriend). The Caller began by telling the 911 operator that police had responded to a complaint involving Appellant and Girlfriend a day earlier but that the responding officer had told the Caller that nothing could be done because Girlfriend would not open the door of the apartment.

The Caller reported that his wife had just received a call from Girlfriend, who was in the apartment with Appellant and was "hysterically crying" during the call. According to the Caller, Appellant was "threatening to kill [Girlfriend], and he's got her hostage" and "pointing a [loaded] gun at her head and threatening to kill her." Then, the Caller stated that he also spoke to Appellant during the call and that Appellant had stated, "I'm gonna kill [Girlfriend]. If the police come over here, it's gonna be a problem . . . ." While speaking with the Caller's wife, Appellant also threatened to kill her. The Caller then quoted Appellant as saying that he was "going

3

to kill everybody." The Caller told the operator that Appellant "ha[d] been smoking meth. He has been on meth. So, he has lost . . . he has really lost his mind." Though Appellant objected at trial to the introduction of this call, he raises no issue on appeal about its admission.

Multiple police officers were dispatched to the apartment. One officer related what he was told by his dispatcher while responding:

> The call details given to us over the MDT was apartment B, the caller's girlfriend's brother . . . had a gun pointed at the caller's girlfriend . . . and that he was possibly high on meth, and that he also said that he would take care of police if they arrived [at] the location.

When officers arrived, they encountered a person who said that he too had received a call from Girlfriend and directed the officers to the upstairs apartment occupied by Appellant and Girlfriend. This person reported that Girlfriend was crying during the call and said that Appellant had a gun. Later, this witness testified that he came to the apartment because he had received a text from Girlfriend saying, "[H]elp me."

Six officers crowded on the stairs leading to the apartment. The officers' dispatch and actions after their arrival were depicted both by the officers' testimony and badge camera videos.

Several of the officers spoke to Appellant through the locked apartment door. They repeatedly asked Appellant to open the door so that they could speak with him and Girlfriend. Appellant refused to open the door.

4

The officer in command decided that they would have to break down the apartment's front door. The door proved remarkably stubborn. Attempts to kick open the door failed. An officer retrieved a breaching tool that was a combination sledge hammer and ax. One officer struck the door with the tool repeatedly and to the point of exhaustion. Another officer took over striking the door with the tool. At that point, a sharp sound other than the striking of the tool was heard. An officer asked if the sound was a gunshot. Others recognized the sound as a shot and felt material falling from the wall though which the shot had passed. The shot fired from inside the apartment had exited over the officers' heads.

A few seconds after the sound of the shot, the officers broke through the door. When they entered the apartment, the officers could only see Appellant's reflection in a mirror as he stood in the apartment's bedroom.

The officers took Appellant into custody. They located Girlfriend crouching on the floor of the bedroom closet. Badge camera video showed her crying hysterically. She repeatedly told the officers how scared she was. She sobbed that she had never seen Appellant "like this," that "he had turned into someone that [she had] never seen," and that she was scared that "he was gonna shoot [her]."

In a chair in the bedroom, the officers found a loaded pistol that was within arm's length of the position where Appellant was standing when the officers entered the apartment. A spent casing of the same caliber as the recovered pistol was found on the floor of the apartment's living room. The door of the apartment opened into

5

the living room, and the position of the casing indicated that the pistol had been fired by a person standing in the living room. The bullet passed through the wall of the apartment across the stair landing from the apartment that Appellant had occupied.

During the guilt/innocence stage, each of the responding officers and a crime-scene investigator testified. Girlfriend did not. The State recounted its unsuccessful efforts to subpoena Girlfriend to testify at trial. The State also called a man who described himself as someone who had been in a relationship with Girlfriend before she began a relationship with Appellant. This was the same person whom Girlfriend had called on the day of the incident and whom the police had encountered when they first arrived at the apartment. After the incident, he had driven Girlfriend to the district attorney's office where she was sworn in as a witness. He said that at that time, he had believed that she was willing to testify but was "scared." He elaborated, "She just, you know, didn't want to testify basically. I mean, you know, she has feelings for [Appellant], and I'm sure that played a large part of it, you know."

The facts set forth above served as the evidence that the jury relied on to convict Appellant. In the punishment phase of the trial, the State reoffered the evidence presented during the guilt/innocence stage. The State offered additional evidence that elaborated on evidence that the jury had already heard. The jury also heard a 911 call from Father reporting a domestic disturbance that had occurred three days before the shooting incident. The call began with the sounds of an altercation during which threats were exchanged between Father and Appellant. Father stated

6

that he wanted Appellant out of his house. Then, Father reported that Appellant had expressed anger and threats toward Father and had fled. Father repeatedly talked over the 911 operator as she tried to obtain a description of Appellant and his direction of travel. While this exchange was occurring, Father stated, "He's got a freakin' drug problem. And I'm so sick of it. He needs . . . he needs help." At one point during the call, Father threatened to kill Appellant, stated that he was going to hurt him, and stated that he had "laid him his ass." The operator continued to try to determine what Appellant was wearing and to clarify his direction of travel. As Father emoted, the operator continued to obtain information about Appellant's clothing.

Next, the State offered the testimony of one of the officers who had testified during the guilt/innocence stage. The officer recounted that she had another contact with Father and Appellant's brother. She did not learn until later that the earlier call and the one that she had described during her earlier testimony were related. In the punishment phase, she testified that she had been dispatched to Father's home as a result of Father's 911 call that the jury had heard. She investigated a family-violence offense of aggravated assault with a deadly weapon. As part of her investigation, she collected a knife used during the offense; a photo of the knife was introduced into evidence. Based on the officer's investigation, a warrant was issued for Appellant's arrest.

Appellant offered one witness at the punishment stage: his mother (Mother). She testified that Father had physically abused Appellant. On cross-examination and

7

without objection, the State asked Mother, "Did you -- have you heard from anyone that [Appellant] was using methamphetamines around this time period?" Mother responded that she had "heard some -- something like that."

## III. Analysis

**A. Testimony from a third party recounting that Girlfriend was scared to testify and still had feelings for Appellant was not testimonial, and the admission of those statements did not violate Appellant's rights under the Confrontation Clause.**

Appellant's first point contends that the trial court erred by admitting testimony from the person who testified that Girlfriend was scared and that she still had feelings for Appellant. To violate Appellant's right to confrontation, the testimony had to be testimonial in nature. Appellant never tells us why Girlfriend's statements were testimonial or how they implicated his rights under the confrontation clause. That failing is understandable because the statements were clearly not testimonial.[1]

The Sixth Amendment to the United States Constitution includes the Confrontation Clause that provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. In essence, that clause bars admission of testimonial statements of a witness who does not appear at trial unless the witness is unavailable to testify and the

---

[1]Appellant also mentions hearsay in his arguments. But his brief focuses on whether the statements that he contends should not have been admitted were testimonial. We will address Appellant's arguments with the same focus.

8

defendant has had a prior opportunity for cross-examination.  *See Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273 (2006) (citing *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S. Ct. 1354, 1365 (2004)).

The Supreme Court's leading case on the issue does not provide a comprehensive definition of a "testimonial" statement.  *See Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374.  But the Confrontation Clause and the core of its application "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'"  *Id.* at 51, 124 S. Ct. at 1364.

In essence, the nomenclature "testimonial" is descriptive:  a statement is testimonial when it packages a statement relevant to the issues in a criminal trial for delivery as testimony at that later trial:

> *"[T]estimonial statements are those 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"*  Burch v. State, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013).  In determining whether a statement is testimonial, we review the objective purpose of the statement, not the declarant's expectations. *Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Crim. App. 2011).  *Statements are testimonial when the circumstances objectively indicate that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.  Id.*  Applying a de novo standard of review, we examine whether the recorded interviews were testimonial and therefore violated [appellant's] Confrontation Clause rights.  *See Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

*Florez v. State*, No. 02-16-00195-CR, 2017 WL 2471095, at *5 (Tex. App.—Fort Worth June 8, 2017, no pet.) (mem. op., not designated for publication) (emphasis added).

One factor that determines whether an objective observer could conclude that

a statement is being packaged for use at a trial is to whom the statement is made: a statement made to non-law-enforcement personnel is less likely to be considered testimonial. *Wear v. State*, No. 02-16-00170-CR, 2017 WL 929529, at *3 (Tex. App.—Fort Worth Mar. 9, 2017, no pet.) (mem. op., not designated for publication) (citing and quoting *Ohio v. Clark*, 135 S. Ct. 2173, 2180–82 (2015), in recognition that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers").

Here, the statements that Girlfriend was scared and had feelings for Appellant and was therefore reluctant to testify explained why Girlfriend did not appear at trial. The statements established no fact relevant to Appellant's guilt.[2] Nor can it be said that she made the statements in anticipation of their use at a subsequent trial. Her exchange was not with law enforcement but with a friend who apparently was helping her by driving her to the district attorney's office and whom she had called for assistance on the night of the shooting incident. Nothing indicates that she knew or anticipated that her friend would later be called as a witness in Appellant's trial and be

---

[2]We do not reach a harm analysis on this issue. But Appellant argues harm by translating the comment that Girlfriend was "scared" into an expression of fear of him. He argues that this expression of fear made it more likely that the jury concluded that he fired a shot through the wall. The record does not support his interpretation. When the witness was asked what Girlfriend was scared of, he responded that she did not want to testify and that she still had feelings for Appellant. His responses indicate that Girlfriend was scared that her testimony might hurt Appellant rather than that she was scared that he might hurt her for testifying.

asked to relate what she had told him. In the simplest terms, the statements were not testimonial because when they were made, they lacked any indicia of ever being used as testimony.

We overrule Appellant's first point.

**B. Father's statement during a 911 call that Appellant had a drug problem was not a testimonial statement, and its admission did not violate Appellant's rights under the Confrontation Clause.**

In his second point, Appellant claims another violation of the Confrontation Clause. This claim involves Father's 911 call, which the jury heard during the punishment phase. The specific focus of the complaint is Father's statement that Appellant had a drug problem. Again, this statement is not testimonial. This is demonstrated by both the nature of the statement and the context in which it was made. Further, the various factors that we must analyze to determine whether an error in admitting the statement was harmful demonstrate beyond a reasonable doubt that it was not. Thus, any error in admitting the statement was harmless.

We have already set out the basic definition of when a statement is testimonial. Here, Appellant argues a basis for determining that the statement was testimonial; it was made to a 911 operator, and at least in some circumstances, such an operator is considered a law-enforcement operative for the purpose of a Confrontation Clause claim.

But as we noted above, a statement is testimonial when it is formulated to package the testimony for use in a later trial. Father's volunteered statement that

11

Appellant had a drug problem does not meet the criteria of being part of a law-enforcement investigative process with "the primary purpose of the interrogation [being] to establish or prove past events potentially relevant to later criminal prosecution." *See Florez*, 2017 WL 2471095, at *5.

Further, a body of law deals with whether statements made during a 911 call are testimonial. Generally, they are not testimonial because they serve a different purpose than establishing facts to be used in a future criminal prosecution:

> "Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Cook v. State*, 199 S.W.3d 495, 498 (Tex. App.—Houston [1st Dist.] 2006, no pet.). For this reason, 911 calls initiated to summon police assistance are generally nontestimonial because they are "a cry for help" or "the provision of information enabling officers to end a threatening situation." *Davis*, 547 U.S. at 832, 126 S. Ct. at 2279; *Cook*, 199 S.W.3d at 498; *see also Rodgers v. State*, No. 09-09-00359-CR, 2010 WL 3043705, at *2 (Tex. App.—Beaumont Aug. 4, 2010, no pet.) (mem. op., not designated for publication) (listing cases in which courts concluded that similar 911 calls were nontestimonial).

*Duchesneau v. State*, Nos. 02-18-00321-CR, 02-18-00322-CR, 2019 WL 2455619, at *2 (Tex. App.—Fort Worth, June 13, 2019, pet. filed).

To guard against a 911 call being used as a subterfuge to admit testimonial statements, the Supreme Court has outlined the criteria that courts should examine to set the boundary between the report of an emergency and the gathering of testimony that may be used at a later trial:

> In determining that the caller's statements were nontestimonial and thus admissible, the [Supreme Court] considered the following factors: (1) the caller was describing events as they were actually happening rather

12

than past events; (2) any reasonable listener would recognize that the caller was facing an ongoing emergency; (3) when viewed objectively, the nature of what was asked and answered was such that the elicited statements were necessary to resolve the present emergency, rather than simply to learn what had happened in the past; and (4) the caller was frantically answering the 911 emergency operator's questions over the phone in an environment that was not tranquil or even safe.

*Id.* (citing *Davis*, 547 U.S. at 826–27, 126 S. Ct. at 2276–77).

Though not directed specifically to 911 calls, we recently noted in a case involving a 911 call that the following factors are also relevant to sorting out those statements that are testimonial and those that are not:

In addition, the following principles are useful in determining whether particular statements are testimonial: (1) testimonial statements are official and formal in nature, (2) interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements than if initiated by the police, (3) spontaneous statements to the police are not testimonial, and (4) responses to preliminary questions by police at the scene of the crime while police are assessing and securing the scene are not testimonial.

*Id.* (citing *Amador v. State*, 376 S.W.3d 339, 342–43 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd)).

The statement made by Father is nontestimonial because it was made to the 911 operator in the context of describing an ongoing emergency. The 911 call involved an event that was occurring contemporaneously with the call. From the sound of the call, Appellant and Father were having at least a verbal confrontation during the first portion of the call. Throughout the call, the 911 operator was attempting to obtain information from Father about the parties' relationship, a

13

physical description of Appellant, and the path he took as he fled. The 911 operator was clearly attempting to resolve the present emergency, both by obtaining the information regarding Appellant's appearance and his direction of travel, and to ensure that Father secured his property in case Appellant returned. Finally, Father was not "frantically answering the 911 emergency operator's questions," but the emotional upset that the recent events caused him is clear. Father did volunteer information about Appellant's drug use, but in the context of the call, that information was relevant to Father's call and to the reason why he sought police intervention.

And in this case, the additional non-911-related factors point even more strongly to the nontestimonial nature of Father's statement about Appellant's drug use. Such factors include (1) the statement was not a formal statement, (2) Father initiated the call, and (3) Father's statement about Appellant's drug use was spontaneous.

## C. Any error in admitting Father's statement about Appellant's drug use was harmless.

But even if Father's statement was testimonial, any error in the admission of the statement—beyond a reasonable doubt—did not contribute to Appellant's punishment. Thus, any error was harmless.

"[A]ny Confrontation Clause violation, once proven, is subject to [a] harmless[-]error analysis." *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007).

14

That analysis hinges on whether we determine "beyond a reasonable doubt that the alleged error did not contribute to appellant's punishment." *Pena v. State*, 554 S.W.3d 242, 254 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *see also* Tex. R. App. P. 44.2(a).

The following factors drive the harmless-error analysis: "(1) the importance of the testimonial statement to the State's case; (2) whether the testimonial statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the testimonial statement on material points; and (4) the overall strength of the State's case." *Pena*, 554 S.W.3d at 254. The court "may also consider the source and nature of the error, the extent of the State's emphasis on the evidence, and the relative weight the jury may have assigned to the evidence as compared with the balance of the remaining evidence relevant to the issue of punishment." *Id.* Finally, the court may "consider any other factor contained in the record that might shed light on the probable impact of the evidence on the minds of average jurors." *Id.*

The question of harmless error goes beyond whether the verdict had evidentiary support; it turns on "whether the alleged constitutional error was actually a contributing factor in the jury's deliberations in arriving at a verdict." *Id.* "Thus, [error in admitting a testimonial statement] does not require reversal unless there is a reasonable possibility that, within the context of the entire trial, the perceived error 'moved the jury from a state of non-persuasion to one of persuasion on a particular

15

issue.'" *Id.* (quoting *Wilson v. State*, 296 S.W.3d 140, 149 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd)).

Appellant fails to mention any of the factors that guide the harm analysis, and the analysis that he does offer is both conclusory and in error:

> This evidence of unlawful conduct at the punishment phase of Appellant's trial where no other punishment evidence was presented to the jury by the State was harmful. Appellant was subject to a punishment range that included probation. The jury's sentence likely contributed to the rejection of a probated sentence and the imposition of a prison sentence that was greater than the minimum sentence available for Appellant's offenses.

Clearly, the State presented evidence other than Father's 911 call at the punishment stage. That evidence included the issuance of a warrant to arrest Appellant for an aggravated assault on his brother.

We interpret the last sentence of the quoted argument to mean that Father's reference to Appellant's drug use motivated the jury not to give Appellant probation. Appellant's theory that Father's drug reference was a thunderclap that drove the jury to decide against giving Appellant probation is unsupportable for the following reasons:

- Father's statement was neither especially important to the State's case nor was it the only source of evidence that the jury heard about Appellant's drug use.

  -Both the 911 call on the night of the shooting incident and an officer's testimony mentioned Appellant's use of methamphetamine.

16

-Without objection, the State asked Mother whether she knew of Appellant's use of methamphetamine, and she said that she did.

-The jury's ability to infer that Appellant's behavior toward the police and Girlfriend was so bizarre that it had an external cause. Girlfriend described him as turning "into someone that [she had] never seen."

- The State had a strong argument that Appellant should be imprisoned. The jury saw how the police officers involved in this matter made repeated efforts to end the matter peacefully. Concern for Girlfriend and her portrayal of being held at gunpoint forced the officers to use the extreme response of breaking down the apartment door. Again, rather than simply accepting the inevitable and opening the door as the officers tried to force it open, Appellant fired a shot that not only endangered the lives of the officers but also of those living in the neighboring apartment.

- The jury's sentence recommendation demonstrated a moderate approach to the punishment they meted out. The penalty range in the charge for the counts of aggravated assault on the public servants was five to ninety-nine years and for the aggravated assault count against Girlfriend was two to twenty years. The prosecutor had asked the jury to impose a sentence of twenty years' confinement. The jury assessed punishment at only eight years' confinement.

- Neither Father's statement about Appellant's drug use nor the other evidence of Appellant's drug use was a focus of the prosecutor's closing argument. The prosecutor did not mention Father's statement or Appellant's drug use in general during his closing argument at the punishment stage. The closest that the prosecutor came to the issue was arguing that "sometimes somebody's problem is just too big for a family to handle."

The jury's measured approach in the punishment it assessed for crimes that endangered the lives of multiple police officers and terrorized Girlfriend, the fact that Father's statement mentioned drug use that the jury was already aware of and that the jury heard about later without an objection from Appellant, and the lack of the State's emphasis on Father's reference to Appellant's drug use convince us that the statement did not persuade the jury to deny Appellant probation. In other words, we conclude beyond a reasonable doubt that any alleged error in admitting Father's statement did not contribute to Appellant's punishment.

We overrule Appellant's second point.

## IV. Conclusion

Having overruled Appellant's two points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 26, 2019