

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,383

**JOHN ALLEN RUBIO, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 03-CR-457-B
### IN THE 138ᵀᴴ DISTRICT COURT
### CAMERON COUNTY

**PRICE, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

Appellant was convicted in November 2003 of capital murder related to the killings

of his three children in March 2003.[1]  Based on the jury's answers to the special issues set

forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the

---

[1]

TEX. PENAL CODE § 19.03(a)(8).

trial judge sentenced appellant to death.[2] This Court reversed appellant's conviction and sentence on direct appeal.[3] Upon retrial, appellant was again convicted of capital murder and sentenced to death on August 2, 2010. Direct appeal to this Court is automatic.[4] After reviewing appellant's four points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## INSANITY DEFENSE

In appellant's fourth point of error, he argues that the jury's failure to find that he was insane at the time of the offense is so against the great weight and preponderance of the evidence as to be manifestly unjust. He appears to reason that the State's evidence did not controvert his evidence of insanity because it focused on his rational conduct before and after the offense rather than his irrational conduct at the precise time of the offense.

It is an affirmative defense that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know his conduct was wrong.[5] An accused is presumed to be sane and bears the burden of proving by a preponderance of the evidence

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Rubio v. State,* 241 S.W.3d 1 (Tex. Crim. App. 2007).

[4] TEX. CODE CRIM. PROC. art. 37.071, § 2(h).

[5] TEX. PENAL CODE § 8.01(a); *see also* TEX. CODE CRIM. PROC. art. 46.03, §§ 1-3, repealed by Acts 2005, 79th Leg., ch. 831, § 1.

that he is insane.[6] The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it.[7] In the context of the insanity defense, the word "wrong" means illegal.[8] If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified.[9]

The issue of insanity ultimately lies within the province of the jury with respect to the credibility of the witnesses, the weight of the evidence, and the limits of the defense itself.[10] On appeal, we review the evidence in the light most favorable to the jury's finding.[11] Our standard of review is whether, after considering all of the evidence relevant to the affirmative defense, the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust.[12]

---

[6] *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993).

[7] *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994).

[8] *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008).

[9] *Id.* at 592.

[10] *Bigby*, *supra*, at 878; *see also Graham v. State,* 566 S.W.2d 941, 952 (Tex. Crim. App. 1978).

[11] *Baker v. State*, 707 S.W.2d 893, 894 (Tex. Crim. App. 1986).

[12] *Meraz v. State*, 785 S.W.2d 145, 154-55 (Tex. Crim. App. 1990); *see also Bigby, supra*, at 875.

In this case, the trial record contains evidence that appellant was legally insane at the time of the offense, but it also contains substantial evidence that he was not legally insane. The evidence presented at trial included the testimony and prior statements of appellant's co-defendant, Angela Camacho, and appellant's statements to police. Additionally, appellant presented the testimony of his relatives and close friends, other witnesses who had observed appellant interacting with Camacho and the children, and two mental health experts. The State presented the testimony of law enforcement officials, an inmate who was housed near appellant, and a mental health expert.

Camacho testified that at the time of the offense, she and appellant had three children: Julissa Quesada, who was three years and one month old; John Esteban Rubio, who was one year and two months old; and Mary Jane Rubio, who was about two months old. Appellant was not the biological father of Julissa and John, but he treated them as if they were his own children.

Camacho and appellant began dating after she left Julissa's father, who beat her. She was pregnant with John at that time. Initially they lived in an apartment with appellant's mother and brothers, but when that arrangement ended, they began living on the street. John was born in January 2002. They eventually moved into a house that had no electricity and no running water. During this period, appellant once asked Camacho what she would do if he killed the children. She did not answer him because she thought that he was joking.

In the summer of 2002, Child Protective Services ("CPS") removed Julissa and John

from the home and placed them with Camacho's mother. Camacho was pregnant with Mary Jane at that time. In order to get Julissa and John back, Camacho and appellant had to take parenting classes and find adequate housing, and appellant had to obtain employment and submit to periodic drug testing for several months to show that he was no longer using drugs. They did all these things, and CPS returned Julissa and John to the couple in the fall of 2002. However, appellant soon lost his job and resumed his substance abuse. Appellant was still unemployed when Mary Jane was born in January 2003.

Camacho testified that appellant washed cars and prostituted himself to make money, but they had trouble coming up with enough money to take care of the family. Appellant and Camacho shared their apartment with appellant's mother and two men who were acquainted with appellant's mother. However, appellant's mother, who was a prostitute and drug addict, often failed to pay her share of the rent. Appellant and Camacho frequently feared that they would be evicted.

Camacho was aware that appellant had a male lover, Jose Luis Moreno, who sometimes provided appellant with money and groceries. Moreno also occasionally supplied appellant with spray paint, which appellant inhaled to get high, and Camacho would throw the cans away when appellant brought them into the apartment. Although Camacho was upset by this situation and sometimes threatened to leave appellant if he did not end his affair with Moreno, she also understood the value of Moreno's material assistance to the family.

Appellant and Camacho were under significant stress, but their children were

generally healthy and well-nourished. Appellant and Camacho usually walked with the children to a nearby charity that served lunch and supper Monday through Friday and lunch on Saturday. They also received benefits from the Women, Infants, and Children ("WIC") Program and food stamps.

Shortly before the offense, appellant and Camacho received a notice informing them that Julissa's food stamp benefits would be terminated because of a problem with her social security number. On the day before the offense, the family went to the hospital to get a copy of Julissa's records. The hospital did not provide them with the records that they needed to correct the problem.

While they were taking the bus home from the hospital, appellant started talking to Camacho about how everyone around them was trying to hurt them. Camacho had not observed him having any problems with people on the bus before. Appellant told Camacho that a woman they saw waiting at the bus stop wanted to steal his money. A little girl on the bus offered a piece of candy to their son, John, but appellant would not let John accept it because he thought it might be poisoned. After they got off the bus, a woman with dark marks on her forehead made a rude gesture toward Camacho, and appellant told Camacho that that was the devil's sign and they needed to hurry home. Camacho believed him and began crying as they grabbed the children and ran.

Once they got home, appellant "swept" an egg over Julissa and cracked it into a glass of water. After looking at the results, appellant said that someone had done something evil

to Julissa. Camacho was so scared that she was not able to sleep that night, and she did not think that appellant slept, either. They were so frightened that they considered taking the family to a motel, but they could not find appellant's wallet. Appellant and Camacho believed that an acquaintance who had been in the apartment earlier that day had stolen it. Appellant's missing wallet also contained their share of the month's rent, which was due the next day.

Around 2:00 a.m., Camacho was in the bedroom when she heard appellant's mother coming into the apartment. Appellant asked his mother for her share of the rent, and his mother told him that she did not have it. Appellant also asked his mother, whom he believed was a witch, to help him fight off the evil spirits, but his mother did not want to help. She told appellant that he had the power and he was the one who would have to use it. She left the apartment around 3:00 a.m.

Camacho testified that, early in the morning, appellant nailed the back door shut to keep bad spirits from entering the apartment. He also killed their pet hamsters with a hammer and bleach because he believed that his mother had worked witchcraft on them and they were possessed. At some point that morning, appellant began talking about the anti-Christ and an approaching battle between seven good men and seven bad men. He told Camacho that he was one of the good men. She had not heard him talking that way before. Camacho testified that, in the past, appellant had seemed like a normal person except when he was inhaling spray paint. However, appellant had not inhaled spray paint for five days.

Later that day, appellant told Camacho that the children were possessed and that he was going to kill them. When Camacho began to cry, he told her to go into the bathroom so she would not see anything. He decapitated their two-month-old child, Mary Jane, and then he screamed for Camacho to help him. Camacho came out of the bathroom and saw that appellant had placed Julissa on the floor next to Mary Jane's headless body. He was trying to stab and decapitate Julissa, but she was screaming and struggling. Julissa cried, "Papi, stop, don't hurt me." Appellant told Camacho to hold Julissa's legs. Camacho did so while appellant stabbed and decapitated Julissa.

Appellant then washed the girls' bodies in the kitchen sink and put them into trash bags. He told Camacho to clean the carpet where he had killed them, and to clean the knife he had used. Camacho wiped the carpet with one of Julissa's dresses. Appellant put the girls' heads into a bucket in the kitchen. When he came out of the kitchen, he told Camacho to have sex with him, saying that he was going to call his friends to come over and rape her and then he would kill himself. They had sexual intercourse and took a shower together. Appellant told Camacho that they would make a pact. He made a cut on his wrist and a cut on her wrist so that they could complete the pact.

Camacho further testified that John was asleep in his crib during these events. When John woke up crying, she went to the bedroom to change his diaper. Appellant came into the room and told her that John was also possessed. She told appellant "no," and she picked John up and held him. However, appellant grabbed John from her, took him into the kitchen,

and stabbed and decapitated him. When Camacho saw John's body on the kitchen floor, she asked appellant to kill her. He tried to choke her or break her neck, but he was not able to do it. Appellant placed John's body and a plastic bag onto a bed, and he put John's head into a plastic bag.

Camacho testified that the couple then walked to the store and bought milk. After they returned to the apartment and put the milk in the refrigerator, appellant told Camacho that they would not see each other any more and they would be going to prison forever. They discussed burying the children's bodies near appellant's grandmother's grave. Camacho recalled that some time before the offense, appellant had told her that it would be a good idea to bury the children near his grandmother. They also discussed going to Mexico because it would be harder for the police to find them there.

While the couple was sitting in the apartment, appellant's brother, Jose Luis Lopez, and Camacho's friend, Maria Elena ("Beva"),[13] arrived for a visit. Jose saw John's body on the bed and started yelling, asking appellant why he did it. Beva also started screaming. Jose and Beva hurried out of the apartment, saying that they would get help and call the police. Camacho and appellant were still waiting in the apartment when Jose and Beva returned with a police officer, who saw what they had done and arrested them.

Camacho also testified about her prior statements to police. Camacho's trial testimony describing appellant's and her delusions was generally consistent with her first

---

[13] Beva's last name is not in the record.

statement to police, but it wholly contradicted her second statement. In her second statement, Camacho expressly denied that she and appellant had killed the children because of a delusion that they were possessed. Rather, she stated that she and appellant had killed the children because they were unable to provide for them and they did not want the children to suffer.

Camacho testified that her second statement to police was a lie. She explained that she provided that statement because the interviewing officer had lied to her about appellant's statement and she wanted her story to be consistent with his. Camacho also stated that, in the days following her arrest, she was hearing voices and she was not in her right mind. Her mental condition improved somewhat after she began taking anti-psychotic medications while in custody. She was still taking those medications at the time of the retrial.

Appellant's statements to police were presented to the jury during the testimony of investigating officers. When investigators first questioned appellant at the police station on March 11, 2003, he stated, "I killed the kids. What else do you want?" However, he went on to explain that he killed the children because they were possessed by the spirit of his deceased grandmother, who spoke to appellant through Julissa and told him that she had taken Julissa's soul. Julissa removed a piece of tape that appellant had placed over an electrical outlet and tried to put scissors into the outlet, which frightened him. All three children started growling and talking to each other like witches.

Appellant told investigators that Camacho also saw that the children were possessed

and she told appellant to kill them. At first, appellant told Camacho that he did not want to kill them, but when she told him again to kill the children, he did so. He tried to choke Julissa while Camacho held her down, but when that did not work, Camacho gave him a knife. He stabbed Julissa a couple of times, but Julissa got up again. She growled and yelled at them, saying, "Mom, please tell dad to stop." Appellant then grabbed Julissa and cut off her head with a cleaver.[14]

Appellant stated that Camacho then told him to kill the other two children because they were still acting like they were possessed. Appellant attacked Mary Jane next, but it was hard to kill her because she was his "own blood." She would not die when he choked her and stabbed her. Appellant started to cut her head off with a regular kitchen knife because he could not find the cleaver, which he said must have been hidden by witches, but the knife did not cut all the way so he tore Mary Jane's head off with his hands. Camacho cried and said, "Please, not my daughter," but appellant told her that they had to kill the children because of the evil presence inside them.

Appellant stated that he and Camacho started to cry, but John was still "acting very evil." Appellant knew that he would have to kill John last because John was the strongest. John growled and yelled, and they both held him down while appellant cut his head off with a large kitchen knife. Appellant believed that he had to kill the children because his

---

[14] Appellant stated that he cut off Julissa's head with a "machete," but the instrument that was described by Camacho and introduced at trial through a photograph was a cleaver.

grandmother's spirit had possessed them.

Appellant told investigators that, after the children were dead, he and Camacho cried and talked about killing themselves. Appellant tried to cut himself, but the knife was not sharp enough. They put the children's bodies and heads into plastic bags. They then showered to clean off all of the blood, and they had sexual intercourse because they realized that they would not be together any more. They talked about burying the children in the back yard of appellant's deceased grandmother's house because she was a witch who would be able to control their evil power.

Appellant stated that he told Camacho that they should call the police and tell them what happened, because "everybody makes mistakes and we are not all perfect." They were feeling nauseated and sleepy from fumes in the apartment when Jose and Beva arrived. Jose, who was also "possessed," asked appellant what he had done to the children, and Beva asked Camacho why she had not called the police. When the police arrived, appellant told the officer to arrest him.

Appellant gave a second statement on March 13, 2003, which was videotaped. It differed somewhat from his initial statement. For example, in his second statement, appellant did not indicate that Camacho told him to kill the children. Instead, he stated that she was in another room when he began to choke Julissa, and he called for her to help him hold Julissa after he was unable to kill her on his own. He also stated that he told Camacho to bring him the knives that he used to kill the children.

Appellant added more details in this statement. For example, he related that John was looking at him in a mean way and "coming at [him]" before appellant started to kill him. John continued to move around even after appellant had decapitated him and drowned his head in a bucket of water, so appellant barricaded the doorway with a table to keep John from coming out of the room. Appellant added that, after all three children were dead, he apologized to Camacho, but told her that he had to do it. He told Camacho that he wanted to make love one last time. At first, she did not want to, but eventually he persuaded her, and they made love and fell asleep. Appellant was still asleep when Jose arrived. When the detectives asked appellant why he told the responding officer to arrest him, appellant stated, "Because I knew we had done bad, both of us, and she admitted it, too." He also said that if Jose had not shown up, he would have called the police and turned himself in.

Appellant explained that he killed the children because they were possessed and because there were fumes in the apartment making him dizzy. He stated that he killed the children in "a moment of insanity," when he "just snapped." He stated that Camacho was also insane at the time of the offense. Appellant denied having hallucinations or delusions prior to that day, and he stated that no one had ever told him before that he was crazy.

Appellant's relatives and friends testified about his history of hallucinations and delusions. Appellant's mother and brothers testified that, from the time he was an adolescent, appellant would tell them that he was seeing things and hearing voices, that God and his deceased grandmother had told him that he was the "chosen one," and that the world

was coming to an end. Appellant told them that his grandmother wanted him to finish what she had started. However, one of appellant's brothers acknowledged that he heard appellant say he was the "chosen one" only when appellant was high.

Several of appellant's brothers testified that their grandmother had practiced witchcraft. One brother testified that appellant was very disturbed by an altar or shrine that they discovered in her bedroom closet while they were living in her house after she died. Appellant would tell his brother that he heard voices talking to him in his sleep, and sometimes he reported hearing the voices while he was awake.

Georgina Castillo, appellant's former girlfriend, testified that when they lived together in that house, appellant believed that his grandmother was communicating with him through his dreams. He would sometimes hear his grandmother calling to him even when he was awake. Castillo often heard appellant talking in his sleep. Occasionally, she would find him sleepwalking or sitting at the foot of the bed, and when she woke him, he would tell her about the things that his grandmother had been saying to him.

Castillo acknowledged that appellant stopped hearing his grandmother's voice after they moved out of that house. She testified that she never saw appellant using drugs or drinking while they were together. After they broke up, however, she saw him intoxicated "in the street" on two or three occasions.

Moreno, appellant's male lover, testified that sometimes appellant would say things that did not make sense, and he would often have seizures during which he seemed to be

blank or absent for a few minutes. Appellant told Moreno that he was the "chosen one" on several occasions. However, appellant also told Moreno a couple of weeks before the offense that a person could get away with murder by claiming to be insane. Moreno acknowledged that he would sometimes give appellant money or groceries. Appellant told Moreno that Camacho had threatened to leave if appellant did not end the affair, and Moreno once offered to help appellant move into an apartment without Camacho and the children. Less than a month before the offense, appellant told Moreno that he wanted to leave Camacho and Julissa and move to Austin with Moreno and the younger children.

On the Saturday before the offense, Moreno stopped by appellant's apartment, but appellant would not go with him because Julissa was sick with a cold. Moreno stopped by again on Sunday, but appellant said that he could not go out because Camacho was threatening to leave him. Moreno stopped by again on Monday, which was the day before the offense. Appellant again told Moreno that he could not go out because Camacho was upset, but he said that he would try to persuade Camacho to let him go with Moreno the next day. When Moreno returned to the apartment the following evening, he saw an ambulance and police cars. A police officer took him to the police station for questioning, and Moreno learned that appellant and Camacho had been arrested for killing the children.

Two people who worked at the charity where the family usually went for meals testified that appellant never had any problems with other people. He seemed normal and did not do anything out of the ordinary. He was loving and playful with the children, and he

would feed them first before returning to the serving line for his own food.

One of appellant's brothers testified that he always thought that appellant loved the children, and whenever appellant had any money, he would spend it on things for the children. A few days before the offense, appellant had asked his brother if he could give him some money or let the family stay with him because they were about to be evicted. Appellant was always asking his brothers for money, but he seemed worried on this occasion. He looked sad when his brother told him that he could not help him. However, except for seeming worried and sad, appellant appeared to be normal.

Appellant's mental health experts opined that appellant was insane at the time of the offense. They diagnosed appellant with paranoid schizophrenia and testified that, as a result of his psychotic delusions, appellant felt compelled to act and was not able to think about the consequences of his conduct at the time of the offense. They opined generally that appellant did not know that his conduct was wrong. However, they did not expressly testify that appellant did not know that his conduct was illegal.

Dr. William Mark Valverde, a psychiatrist, testified that he first interviewed appellant in April 2003. He conducted an evaluation, including an investigation into appellant's life history and the chain of events that led up to the offense. He also evaluated appellant's demeanor and behavior during the interview. Valverde did not interview any other witnesses, but he reviewed appellant's school records, psychological test results, and the videotaped confession.

Valverde testified that paranoid schizophrenia is harder to identify than other types of schizophrenia because a person with this disorder may appear rational and engage in normal conversations until the topic of discussion touches on his area of delusion. Paranoid schizophrenia does not cause the level of deterioration of the personality that is generally observed with other types of schizophrenia. Individuals with paranoid schizophrenia generally appear much more intact and organized than individuals with other types of schizophrenia.

Although paranoid schizophrenia is chronic, the symptoms may be better or worse at different times. Some factors that have been found to exacerbate the symptoms include sleep deprivation, stress, substance abuse, and medical illness involving fever. On the other hand, if exacerbating factors are not present, the mental illness might appear to be in remission. Therefore, the fact that appellant did not continually report delusions and hallucinations while he was in custody was not necessarily inconsistent with a diagnosis of paranoid schizophrenia.

Valverde testified that a person who is malingering or fabricating a story typically has difficulty keeping all the details in order, but appellant's repeated accounts of the offense varied little over the course of multiple interviews. Valverde opined that, at the time of the offense, appellant was so engrossed in his beliefs that he was engaged in a battle between good and evil and that evil spirits had possessed the children that he did not know that his conduct was wrong. However, Valverde acknowledged that, even though appellant felt

compelled to act regardless of the consequences, he might have known that others would view his conduct as wrong or illegal.

Valverde stated that appellant's prognosis was poor even with treatment because paranoid schizophrenia is a chronic mental illness. People with this illness typically lack insight into their condition and do not recognize that they are mentally ill. They refuse medication because they are suspicious that others are trying to hurt them or take away their special powers. In addition, paranoid schizophrenia is less responsive to medication than other types of schizophrenia. In appellant's case, it was also likely that he had sustained brain damage from repeated inhalant abuse.

Valverde acknowledged that he had not seen appellant since 2003. He also acknowledged that a substance-induced psychosis could cause symptoms similar to those of paranoid schizophrenia, including disorganized thinking, paranoid delusions, and hallucinations. He recalled that appellant's family members had testified in prior proceedings that, when appellant inhaled spray paint, he would not sleep or eat and would become suspicious and paranoid. However, Valverde did not believe that appellant's psychotic delusions at the time of the offense were the result of substance abuse because appellant continued to maintain those delusions six months after his arrest.

Valverde testified that the most common reasons for fathers to kill their children are jealousy, financial difficulties, marital discord, and substance abuse. He acknowledged that these reasons are separate and distinct from psychosis. Fathers kill their stepchildren more

often than they kill their natural children.

Dr. Raphael Morris, a forensic psychiatrist, first interviewed appellant in 2008. He interviewed appellant seven or eight times, and he also interviewed many people who knew appellant. He reviewed psychological test results and the reports of previous mental health experts. Morris compiled a social history, a family history, and a medical history. He noted appellant's history of delusional thoughts, the unrealistic way in which appellant misinterpreted and attached undue significance to things that he saw, and appellant's history of intense nightmares and sleep disturbances.

Morris diagnosed appellant with inhalant dependence and marijuana dependence as well as paranoid schizophrenia. He acknowledged the importance of knowing appellant's substance abuse history, especially the timing of his last spray paint inhalation before the offense. However, Morris had been unable to pinpoint the timing of appellant's last spray paint abuse because appellant's records contained conflicting reports.[15] Therefore Morris was not sure what role, if any, substance abuse might have played in appellant's symptoms and in the commission of the offense. Nevertheless, he was of the opinion that appellant's primary condition was schizophrenia.

---

[15] Appellant initially told police that he had not used any controlled substance for three months before the offense, but his probation records showed that he had tested positive for controlled substances, including marijuana and cocaine, on two occasions during the two months before the offense. He told Valverde that he inhaled spray paint three days before the offense. Later, he told another mental health professional that he had inhaled spray paint two days before the offense and that he probably would not have killed the children if he had not done that. Camacho testified that appellant had last inhaled spray paint five days before the offense.

Morris described a pattern of psychological deterioration that began a couple of years before the offense, in which appellant's ability to function declined as his mental illness developed. Appellant was the only one of his brothers who graduated from high school, but since then he had become unable to hold a job or take care of a house. In the weeks leading up to the offense, appellant misinterpreted other people's conduct and imagined that ordinary things signified danger and witchcraft.

Morris also described the stressors that confronted appellant in the days leading up to the offense, including: the prospect of probation revocation based on his positive drug test results; Camacho's threat to leave him if he did not stop inhaling spray paint and seeing Moreno; his ongoing difficulties in paying the rent; his anger toward his mother, who failed to pay her share of the rent and often came home intoxicated; Julissa's illness; appellant's and Camacho's general difficulties in taking care of three small children; his lack of sleep immediately before the offense; and general chaos in his day-to-day life. Morris opined that these stressors, combined with the onset of acute mental illness, factored into appellant's commission of the offense.

In Morris's opinion, at the time appellant committed the offense, he was terrified of the demons that he believed had invaded his home and possessed his children. He was completely caught up in his own terror and focused on freeing the children from the demons. Because of his psychotic delusion, appellant was not thinking about the wrongfulness of murdering his children, and he did not understand the consequences of his actions. After he

killed the children and believed that the demonic possession was gone, appellant would have felt some relief and might have begun considering whether he should have acted differently, but at the time he was actually committing the offense, appellant was so consumed by his delusion that he was not able to think about right and wrong.

On cross-examination, Morris acknowledged that, in his report he discussed whether appellant knew that his conduct was morally wrong rather than whether he knew it was illegal. Morris also admitted that he was unaware that, shortly before the offense, appellant had told Moreno that a person could get away with murder by claiming to be insane and that this information, if true, might have affected his opinion. Morris was also unaware of Camacho's testimony that appellant once asked her what she would do if he killed the children. He acknowledged that he would have wanted to know that information in forming his opinion.

However, Morris maintained his opinion that appellant was insane and did not know that his conduct was wrong at the time of the offense. He pointed out that appellant had repeatedly provided consistent, detailed accounts of his delusions over a two-year period. Also, appellant had not exaggerated his mental illness symptoms or exhibited odd behaviors while in jail and prison, although such exaggeration would be expected of someone who was trying to appear to be mentally ill. In addition, appellant refused to take his anti-psychotic medication, which was not consistent with trying to appear to be mentally ill.

Morris testified that appellant's recent statement that he no longer believed that he

was the "chosen one" did not undermine Morris's opinion that appellant is schizophrenic and that, as a result of this disease, he experienced psychotic delusions at the time of the offense. A psychotic delusion is a fixed, false belief, in the sense that a person with a psychosis will remain convinced of his delusion even in the face of evidence to the contrary. However, a person who suffers from schizophrenia may have different delusions at different times in his life and may hold those delusions with varying levels of intensity. In this case, the structured setting of prison might have moderated appellant's symptoms. Even if appellant no longer expressed the particular grandiose delusion of being the "chosen one," he continued to hold many of the same paranoid delusions that he held at the time of the offense, and he still had the same unrealistic, paranoid way of interpreting ordinary things around him.

The State, on the other hand, presented substantial evidence that appellant was not legally insane at the time he committed the offense. The first law enforcement officer who arrived on the scene testified that, when he saw a child's decapitated body in the bedroom and asked what had happened, appellant held his hands out as if he expected to be handcuffed and told the officer to arrest him. Guards and administrators who came into contact with appellant after his arrest testified that appellant did not seem agitated or exhibit strange behavior. An inmate who had been housed near appellant shortly before the retrial testified that he overheard appellant saying that he was going to fake mental retardation and raise an insanity defense. When the inmate stated that appellant was not mentally retarded or crazy, appellant gestured for him to be quiet, saying, "I know that[,] but they don't."

Someone asked appellant about a scar on his wrist, and appellant stated that he had tried to commit suicide after the offense but failed because the knife was not sharp enough.

Dr. Michael Welner, a forensic psychiatrist, testified as an expert witness for the State. He testified that he interviewed appellant for fourteen hours on June 23 and 24 of 2010, about a month before the retrial. He also interviewed many people who knew appellant. Additionally, he reviewed witness statements, transcripts of testimony, appellant's statements, mental health evaluations, and institutional records.

Welner identified several instances in which appellant's professed delusions were contradicted by other things that appellant had said or done. For example, in appellant's first statement following his arrest, appellant did not claim that he committed the murders because he was the "chosen one"; instead, he asserted that he killed the children after Camacho instructed him to do it. Appellant also told officers that he had considered calling the police right after the offense, reasoning that "everyone makes mistakes." Welner testified that appellant's deflection of responsibility onto Camacho and his description of the offense as a "mistake" were indications that appellant was aware that his conduct was wrong. In addition, appellant's actions immediately after the offense further indicated that he knew his conduct was wrong. For example, he cleaned up the crime scene, concealed the children's bodies in trash bags, asked Camacho to forgive him, and had sexual intercourse with Camacho after telling her that they were going to jail and would not see each other again.

Welner further noted that appellant told investigators that, while he was committing

the offense, Julissa asked her mother to tell him to stop. Welner opined that appellant's statement indicated that he recognized Julissa when he killed her; it was not consistent with his professed delusion that his deceased grandmother had possessed Julissa and was speaking to him through her body. Appellant also admitted that, when he killed Mary Jane, Camacho cried and said, "Please, not my daughter." This was inconsistent with his statement that Camacho had instructed him to kill the children.

Welner also pointed out that, although appellant stated to investigators that he believed that Jose and the responding officer were possessed, appellant did not act aggressively toward them. Welner opined that, if appellant's act of killing the children really was driven by a psychotic delusion that prevented him from knowing that his conduct was wrong, then appellant would have been similarly driven to act when confronted by adults who were possessed; he would not have modified his conduct based on the possessed person's relative size and strength.

Welner added that, although appellant asserted that he tried to commit suicide after the offense, the superficial scratch wound on appellant's wrist was not consistent with a suicide attempt. Appellant had sharp kitchen knives and a cleaver that he had just used to stab and decapitate three children. This fact belied his assertion that he could not kill himself because the knife was not sharp enough. Welner concluded that appellant's representations about his delusions at the time of the offense were misleading and self-serving.

Welner opined that appellant did not suffer from a severe mental disease at the time

he committed the offense. When Welner interviewed appellant, appellant's thought patterns were organized and coherent, his demeanor was open and personable, and he was able to think abstractly and use humor and idioms appropriately. Welner stated that this presentation was not consistent with schizophrenia.

During the interviews, appellant spoke freely and in excessive detail about his sexual experiences with women, but he was guarded about his homosexual activity. Appellant also tended to deflect responsibility for his bad conduct onto others. For example, when asked about an incident in which he beat up his girlfriend's father in her presence, appellant justified his conduct by explaining that the victim had provoked him by insulting his mother. Appellant also discounted the parts of his history that might cast him in a negative light. For example, he denied and minimized his history of substance abuse, even though his records showed a history of responding to social disappointment by abusing substances. Appellant became defensive when confronted with such inconsistencies between his self-report and his records, but he quickly regained his composure when the conversation shifted to other subjects. Appellant's conduct of being open about some topics but evasive and defensive about others indicated a level of social awareness and responsiveness that was not typical of someone suffering from schizophrenia.

Welner also testified that appellant's pre-arrest history of delusions and hallucinations coincided with his history of substance abuse. Except for his sleep disturbances, appellant's family members indicated that he seemed normal when he was not abusing substances. In

the days leading up to the offense, people who interacted with appellant did not observe bizarre behaviors, and appellant engaged in social behaviors such as taking the bus and visiting with friends and relatives. This conduct was not consistent with the social withdrawal typically associated with the onset of a severe mental disease.

In addition, Welner testified that a severe mental disease would not switch on and off, but would be continuous. Appellant took anti-psychotic medications for only a brief part of the time that he was in custody, but he did not generally exhibit psychotic symptoms. Psychotic delusions are fixed beliefs that do not change over time. However, appellant's descriptions of his delusions, and the strength of his professed belief in them, had evolved. Welner opined that this evolution corresponded to changes in appellant's understanding of the insanity defense.

In conclusion, the record contains conflicting evidence as to whether appellant was legally insane at the time he committed the offense. The credibility and weight of this evidence were within the province of the jury. Appellant had the burden of proving his affirmative defense by a preponderance of the evidence. The jury's implicit determination that appellant did not meet this burden was not so against the great weight and preponderance of the evidence as to be manifestly unjust. Point of error four is overruled.

## FUTURE DANGEROUSNESS TESTIMONY

In his first point of error, appellant asserts that the trial court abused its discretion by permitting State's witness Alan Brantley to testify as an expert at the punishment phase that

appellant is a continuing threat to society. Specifically, he argues that Brantley's methodology was not reliable because: (1) there is no relevant scientific community; (2) Brantley has never tried to show that his methodology produces accurate and consistent results; (3) his methodology has not been recognized by any peer group; and (4) there is no basis for his methodology in the relevant scientific literature. Appellant reasons that Brantley's methodology was similar to the methodology that was employed by the future dangerousness expert in *Coble*,[16] which this Court rejected as not sufficiently reliable.

Brantley testified that he is the president of a behavioral-science consulting business. Before he started that business, Brantley was a Supervisory Special Agent for the Federal Bureau of Investigations ("FBI"), where he had worked for over twenty years. For most of his career at the FBI, he had been a criminal investigative analyst, responsible for threat analysis and assessment of dangerousness in violent crime matters. Before he joined the FBI, he was a senior psychologist for the North Carolina Department of Corrections, where he provided services to the inmate population as well as evaluations for pre-sentence diagnostic studies, testing for parole consideration, and evaluations of inmates for assignment to the governor's mansion.

Brantley has a Master's degree in counseling and psychology. He has received specialized professional training and has lectured and taught on the topics of criminal investigative analysis, crime scene analysis, threat assessment, and assessment of

---

[16] *Coble v. State,* 330 S.W.3d 253 (Tex. Crim. App. 2010), *cert. denied,* 131 S.Ct. 3030 (2011).

dangerousness. He has published an article about future dangerousness in a peer-reviewed journal, and he is a member of several professional organizations. He has testified as a future dangerousness expert in criminal and civil cases around the country. In Texas, he has testified on the subject of future dangerousness in seven capital cases.

Brantley described his criminal investigative analysis as "basically a detailed and careful review of submitted case materials . . . from [an] investigative, forensic science[,] and behavior perspective." The purpose of this analysis "is to provide . . . information about violent criminal behavior that may go beyond the personal and professional life experiences of those requesting the services." Brantley testified that his methodology "is just a complete in-depth review of all the case materials."

In preparing his analysis in this case, Brantley reviewed voluminous materials, including: crime scene photographs; autopsy photographs; investigative reports and police reports; mental health evaluations and reports from psychiatrists and psychologists; witness statements; statements from appellant and Camacho; school records; jail records; Texas Department of Criminal Justice records which included medical, mental health, and custody-related records; and transcripts from court proceedings. Brantley also interviewed correctional officers who had knowledge of the security measures and custody classification system of death row. Based on this information, Brantley organized his assessment into ten major categories: (1) nature and severity of the offense; (2) history of emotional problems and mental health complaints; (3) history of drug abuse and arrest; (4) age of onset of

childhood adjustment problems; (5) history of childhood physical and sexual abuse; (6) lack of remorse and empathy for victims; (7) poor insight and judgment; (8) victim population; (9) failure to benefit from past intervention efforts; and (10) history of institutionalization.

Brantley opined that appellant, "when confronted with multiple acute stressors, and when under the influence of illicit drugs or chemicals, can be very dangerous." The stressors that confronted appellant at the time of the offense were financial (threat of eviction because he could not pay the rent), relational (the children's mother was threatening to leave him if he did not end his affair with Moreno), being physically and psychologically unable to provide adequate care for the children, and the prospect of going to jail on a probation revocation. For an individual like appellant, the pressure of those destabilizing influences, plus the effects of drugs or alcohol, created a lethal combination.

Brantley stated that if appellant were placed into the general prison population, he would be exposed to some of the same types of stressors that confronted him at the time of the offense, and he would have access to illegal substances. In the general population, appellant would interact with other inmates who had a variety of personalities and agendas, and based on appellant's history, it was likely that he would have adjustment problems stemming from money and sex. Appellant's disciplinary records reflected that, even when he was in the most secure custody level of death row, appellant had set multiple fires and tested positive for marijuana. There would be increased opportunities for such behavior in the general population. Brantley testified that there was a high probability that a person like

appellant would commit criminal acts of violence in the future if housed in the general population.

On cross-examination, Brantley acknowledged that there is no way to describe a rate of error with his technique and that his outline was a guide, not a test or psychometric instrument. He also acknowledged that his expertise was based on his review of relevant literature and his professional knowledge and experience, rather than clinical testing and studies. Brantley believed that other similarly qualified professionals would rely on the same information that he had reviewed and would replicate his findings, although they might not organize the information into the same ten categories that he used. He acknowledged that he could not predict violence; he could only assess a probability of dangerousness. He could not assign a percentage to the likelihood that someone would be violent in the future but instead described the likelihood as a high, moderate, medium, or low probability.

Appellant's complaints, and the record of Brantley's testimony, are similar to the appellant's complaints and the record of Kenneth Lanning's testimony in *Nenno*.[17] Nenno complained that the State failed to show the validity of the scientific theories underlying Lanning's testimony or the validity of the method used for applying the theories, and that Lanning's testimony did not satisfy all of the *Kelly*[18] factors.[19] Specifically, Nenno argued

---

[17] *Nenno v. State,* 970 S.W.2d 549 (Tex. Crim. App. 1998).

[18] *Kelly v. State,* 824 S.W.2d 568 (Tex. Crim. App. 1992).

[19]

(continued...)

that the State failed to produce any evidence that: (1) the theories underlying Lanning's testimony were accepted as valid by the relevant scientific community; (2) the alleged literature on the theories supported his theories; (3) there were specific data or published articles regarding the area of future dangerousness of prison inmates; (4) his theories had been empirically tested; (5) he had conducted any studies or independent research in the area of future dangerousness; or (6) anyone else had tested or evaluated the theories upon which his testimony was based.[20]

We disagreed and found that the reliability of Lanning's testimony was sufficiently established under Texas Rule 702 even though it did not strictly meet all of the *Kelly* factors.[21] *Kelly's* requirement of reliability applies to fields of study aside from the hard sciences, but with less rigor than to the hard sciences.[22] Rather than addressing the validity of a "theory" or "technique" in these fields, the appropriate questions are whether: (1) the field of expertise is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon and/or utilizes the

---

[19](...continued)
*Nenno, supra*, at 560.

[20] *Id.*

[21] *Id.* at 562.

[22] *Id.* at 561.

principles involved in the field.[23]  In addition, hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences.[24]

Lanning was a Supervisory Special Agent in the Behavioral Science Unit of the FBI, where he had been assigned for fifteen years.[25]  He had been with the FBI for over twenty-five years.[26]  Lanning testified that his analysis was based upon his experience studying cases.[27]  He did not contend that he had a particular methodology for determining future dangerousness.[28]  He testified that he studied in excess of a thousand cases that concerned the issue of future dangerousness in some fashion.[29]  His research involved studying solved cases to attempt to understand the dynamics of what occurred.[30]  This research included personal interviews with inmates, examining the inmates' psychological

---

[23] *Id.*

[24] *Id.*

[25] *Id.* at 551, 562 & n.10.

[26] *Id.*

[27] *Id.* at 562.

[28] *Id.*

[29] *Id.*

[30] *Id.*

records, and examining the facts of the offenses involved.[31]

From the information he had reviewed about Nenno, Lanning concluded that Nenno was a pedophile.[32] He testified that such a person was difficult to rehabilitate.[33] After being given a lengthy hypothetical that matched the facts shown by the evidence, Lanning testified that an individual matching the hypothetical would be an extreme threat to society.[34]

As with Lanning, Brantley's expertise came primarily from his years of studying violent criminal behavior as a law enforcement professional. Brantley similarly did not purport to apply a scientific methodology, instead acknowledging that his analysis was just an in-depth review of the case materials. He further acknowledged that the ten categories he used in his assessment were a means of organizing information, not a test or a psychometric instrument. Brantley's expertise was not in a "hard science" field, and he did not hold himself out as a psychiatric expert. Hence, the analysis we adopted in *Nenno* applies to this case, and we reach a similar result.

Contrary to appellant's arguments, the record reflects that Brantley's work in the field of future dangerousness has been accepted as useful and reliable within his professional

---

[31] *Id.*

[32] *Id.* at 551.

[33] *Id.*

[34] *Id.*

community. Because Brantley did not purport to apply a scientific methodology, he was not required to show that he had conducted formal testing to verify that his methodology produces accurate and consistent results. He testified that other professionals similarly qualified would use the same information he had used and would replicate his findings in this case. Appellant's claim that Brantley's methodology has not been recognized by any peer group is unavailing because Brantley did not purport to apply a scientific methodology.[35] Further, Brantley testified that he co-authored an article on future dangerousness that was published in a peer-reviewed journal. Finally, Brantley testified that his expertise is based on his review of the literature and his professional experience. As such, Brantley's analysis has a basis in the relevant literature. Brantley sufficiently established the reliability of his testimony by reference to the standards applicable to his particular professional field.[36]

This case is readily distinguishable from *Coble,* in which we held that Dr. Richard Coons's expert testimony concerning future dangerousness was not admissible under Rule 702 because it was not sufficiently reliable.[37] Coons was a medical doctor and forensic psychiatrist who purported to apply psychiatric principles in making a forensic psychiatric

---

[35]

*See Nenno, supra*, at 562 ("To the extent that a factfinder could decide that the absence of peer review cast doubt on the credibility of the testimony, such affects the weight of the evidence rather than its admissibility").

[36]

*See Coble, supra*, at 274 ("Under either *Daubert/Kelly* or *Nenno,* reliability should be evaluated by reference to the standards applicable to the particular professional field in question").

[37]

*See id.* at 270.

assessment of future dangerousness.[38] However, he described a wholly subjective methodology that he had created for his own use, and he relied solely on materials supplied by the District Attorney's Office.[39] Coons acknowledged that he did not know of any books or articles in the fields of psychiatry and psychology that used his factors.[40] He admitted that other psychiatrists might not apply the factors he had relied upon to assess future dangerousness, and that they might disagree over the conclusions that could be drawn from the application of these factors.[41] When the prosecutor read him the names and titles of articles on future dangerousness that had been cited in a legal brief, Coons was not familiar with any of them.[42] Nevertheless, the trial court admitted his expert testimony. As a result, Coons presented his expert opinion to the jury with an aura of scientific certainty that was not supported by his assessment.[43]

Unlike Coons, Brantley did not purport to be a psychiatrist or to apply the principles

---

[38] *Id.*

[39] *See id.* at 271.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 272.

[43] *Id.* at 274 & n.46, 279 & n.68; *see also Morris v. State,* 361 S.W.3d 649, 674 (Cochran, J., concurring) ("As we stated in *Coble v. State,* the danger with unscientific expertise posing as science is that the jury will accept it uncritically").

of forensic psychiatry, and he acknowledged that his methodology was not scientific. However, he sufficiently established the reliability of his testimony by reference to the standards of his particular professional field. We hold that the trial court did not abuse its discretion by admitting Brantley's testimony.[44] Point of error one is overruled.

## 10-12 RULE

In points of error two and three, appellant asserts that Article 37.071's provision for jury consideration of mitigating evidence violates the Eighth and Fourteenth Amendments of the United States Constitution and Sections 13, 19, and 29 of the Texas Constitution, and that the punishment-phase jury instructions violate the Sixth and Eighth Amendments of the United States Constitution and Sections 15 and 29 of the Texas Constitution. Appellant argues that the "10-12 Rule" unconstitutionally prevents a single juror from giving effect to his or her belief that a mitigating factor militates against the imposition of the death penalty. He argues that nine or fewer jurors, each of whom may believe in a different mitigating factor, cannot impose a "Yes" answer on the other jurors to prevent a sentence of death without violating the trial court's instructions.

Appellant acknowledges that this Court has consistently rejected these claims, but he argues that our decisions were based on a fundamental misunderstanding of *Mills*[45] and

---

[44] Appellant does not contend that Brantley's testimony was inadmissible under Tex. R. Evid. 403. *See Nenno, supra*, at 560. Therefore we will not address this matter under Rule 403. *See* TEX. R. APP. P. 33.1(a).

[45]

(continued...)

*McKoy*.[46] He further asserts that we should reconsider our prior opinions because of the danger that fewer than ten jurors in a hung jury, who have in fact decided that sufficient mitigating circumstances exist to merit a life sentence, will change their votes in response to an *Allen*[47] charge because they will not realize that they have already arrived at a legitimate result that must be accepted by the court. However, appellant does not allege, and the record does not reflect, that there was a hung jury or that an *Allen* charge was given to the jury in this case.

We have previously rejected these claims, and appellant has not persuaded us to reconsider them.[48] Points of error two and three are overruled.

We affirm the judgment of the trial court.

DELIVERED:       October 10, 2012
DO NOT PUBLISH

---

[45](...continued)
*Mills v. Maryland,* 486 U.S. 367 (1988).

[46]
*McKoy v. North Carolina,* 494 U.S. 433 (1990).

[47]
*Allen v. United States,* 164 U.S. 492, 501 (1896); *see also Barnett v. State,* 189 S.W.3d 272, 277 & n.13 (Tex. Crim. App. 2006) ("An *Allen* charge . . . . reminds the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve").

[48]
*See Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Smith v. State,* 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007).