

NUMBER 13-10-00643-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**MIRNA MATIANA GARCIA,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

**On appeal from the 332nd District Court
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Justices Rodriguez, Benavides, and Perkes
Memorandum Opinion by Justice Benavides**

A Hidalgo County jury convicted appellant, Mirna Matiana Garcia, of murdering

her husband, Antonio "Tony" Garcia, a first-degree felony, and assessed punishment at

fifty-five years' imprisonment in the Texas Department of Criminal Justice—Institutional

Division. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). By issues one, two,

and four Garcia, asserts that the trial court erred by (1) admitting an out-of-court

videotaped conversation in violation of her constitutional right to confrontation; (2) admitting her December 11, 2008 statement to police; and (3) denying her request for an accomplice-witness jury instruction. By her third issue, Garcia argues that the evidence was insufficient to sustain her murder conviction. We affirm.

## I. BACKGROUND

The following relevant evidence was presented at trial. In the early afternoon of November 21, 2008, Antonio "Tony" Garcia's body was found lying face down in a pool of blood on the floor of his Cactus Iron Works business office located along Monte Cristo Road in Edinburg. Esparza Pest Control employee Jason Rodriguez made the discovery after he entered Cactus Iron Works (CIW) to collect payment from Tony for a fumigation job that he completed earlier that morning. Rodriguez immediately called the police.

Edinburg police officers Kenneth McEwen and Rolando Roman were the first to respond. Officer McEwen found Tony's body just as Rodriguez described, but noted a visible gunshot wound to the back of Tony's head. The officers located two CIW employees on the premises, Jose Gomez and Miguel Jimenez, and made contact with them. Garcia, who was also a CIW employee, arrived at the business shortly after the police responded.

Edinburg police investigator Robert Alvarez was dispatched to the scene. Alvarez noted that during his initial walkthrough of CIW: (1) there were no visible signs of a struggle in the office where Tony's body was found; and (2) live rounds and spent casings were scattered on the floor of Tony's office as well as in the doorway of Garcia's

2

office, which was located across the hall from Tony's. Alvarez eventually made contact with Garcia, who was still standing outside of the business.

One of the first things Garcia told Alvarez was that she was not present at CIW when the police arrived, but was, instead, at the bank. A short time later, Alvarez transported Garcia to the Edinburg police station for further questioning.[1] At the station, Garcia signed an affidavit outlining the following facts:

- She and Tony spent the morning of November 21, 2008 running errands together in Brownsville.

- On the trip back to Edinburg, Tony received several phone calls from someone named "Rodolfo."

- After they returned to CIW, Tony asked Garcia to take care of payroll for the week, and Garcia complied.

- Garcia stated that she left CIW for Tagle's Minimart in order to cash the payroll check, and then went to the bank to deposit the cash.

- Garcia returned to CIW to find the police.

- Garcia asserted that Tony was involved in a side-business of purchasing and selling crude oil. According to Garcia, Tony conducted this business with Mexican drug cartel members known as the Zetas.

- Tony was "very scared" of these individuals.

After signing her affidavit, Garcia submitted to a gunshot residue (GSR) test of her hands and allowed police to take her clothes for further evidence collection.

Edinburg police investigator James Ramirez interviewed Gomez the day of the murder. Investigator Ramirez indicated that Gomez was the supervisor/foreman of CIW. Gomez told Ramirez that he and Jimenez were working in the CIW yard on November 21, 2008 when Tony drove into work. Gomez stated that he also saw a red

---

[1] Investigator Alvarez testified at trial that, at this point in time, Garcia was not taken into custody.

3

truck arrive at CIW shortly after Tony arrived. Gomez told police that Tony had told him that he had business dealings with the Zetas.

Jimenez, the other CIW employee present when police arrived, testified at trial that Gomez was at CIW on the morning of November 21, but he left off-site for about an hour and returned close to lunch time. According to Jimenez, when Gomez returned, he told Jimenez that they needed to work on a new project and sent him to retrieve materials from the back of the yard. Jimenez complied, while Gomez stayed behind for about five minutes. Gomez later met up with Jimenez in the back of the CIW yard. Jimenez then returned to CIW's main shop to begin work on the new project. While working, he observed: (1) Garcia leave the CIW shop; (2) the Esparza Pest Control truck arrive; and (3) the police arrive.

In a recorded statement on December 3, 2008, police again questioned Garcia about Tony's personal life and business affairs. Garcia cooperated throughout the interview and expressed fear that she would also be killed. Garcia told Investigator Alvarez that Tony was alive when she left the office that afternoon.

After the December 3, 2008 interview, Investigator Alvarez was able to set up a time frame of events leading up to Tony's murder by using Garcia's statement and video surveillance from the various locations that the couple visited the morning of November 21st. Police also used Tony's cell phone bill to estimate his time of death somewhere between 1:04 p.m., when he last received a phone call, and 1:18 p.m., when he stopped answering his phone.

4

Investigator Alvarez also located Armando Cortina, Garcia's ex-lover. At trial, Cortina admitted to having a prior sexual relationship with Garcia during her marriage to Tony, but stated that he ended it after Tony discovered the affair. Cortina testified that Garcia would always tell him that she wished Tony was dead, but he passed it off as a joke. Cortina further testified that Garcia's statements to him about Tony indicate that she "probably" wanted Cortina to find someone to kill Tony, but he never followed through.

On December 11, 2008, Investigator Alvarez again interviewed Garcia at the Edinburg police station.[2] During this interview, Garcia said that Tony was physically abusive, but continually denied that she murdered him. After further questioning and interrogation, including a discussion of her affair and conversations about Tony with Cortina, Garcia changed her story. Garcia told Investigator Alvarez that a man "dressed in black" walked into the CIW offices with a gun that afternoon, pointed it at her, and told her not to move. Garcia then stated that the unknown man shot Tony and ran out of the building. Garcia stated that at that point, she "yelled" and left CIW to take care of the payroll, just as Tony had asked her to do, because she was afraid.

After further interrogation, Garcia again changed her story. Garcia told Investigator Alvarez that Gomez was the shooter and not the man in black, as she had previously asserted. Garcia told Investigator Alvarez that "it happened so fast," because Gomez walked in, and the next thing she heard were shots fired. Garcia said that after the shooting, Gomez went to her office and told her to give him "two minutes," then directed her to leave CIW and not say anything. At this point, Garcia also admitted

---

[2] This interview was videotaped and played for the jury at trial.

that she and Gomez had "liked" each other, but that they never had sexual relations. Garcia denied knowing why Gomez killed Tony. Garcia also stated that Gomez did not threaten to shoot her on November 21, 2008. Garcia said that after the shooting, she sat "frozen" in her office, and that Gomez also told her to tell the police that "two guys came in and did this." She then left CIW to take care of the payroll, just as Tony had asked, and returned to find the police. After this interview, Garcia and Gomez were placed under arrest and arraigned the following day.

Shortly after their respective arraignments, police officers placed Garcia and Gomez in the same interview room to await transport to the county jail. Investigator Alvarez and his supervisor, Sergeant Oscar Treviño, decided to place Garcia and Gomez in the same room to "test some things" out—i.e., that Garcia claimed to be very afraid of Gomez and that Gomez claimed to be "appalled" that Garcia would implicate him in the crime. According to Investigator Alvarez, he had used this tactic "several times" in the past with other individuals, wherein he placed them in the same interview room and watched them remotely from another room. Investigator Alvarez testified that inside the interview room, there is a "large circular globe" where a camera is attached, similar to those found in banks, and that it was fair to say that the globe was noticeable to anyone who entered the room. A microphone is also present in the room, but was not as visible as the camera. Over Garcia's objections, the three hour and twenty-minute video of Garcia and Gomez was played for the jury.

In the video, Garcia and Gomez spoke to each other sporadically between long periods of silence.[3]   Throughout the video, Garcia's head was down, while Gomez sat in a chair facing the camera.   At one point, Gomez stated, "I did it for you, babe," to which Garcia replied "[y]eah, but they actually think I shot him . . . . There is no sense in both of us going down."   Gomez later told Garcia that had she not left him the key, "nothing would have happened," "but you were in a hurry."   Gomez then told Garcia that he wanted to "go slow," but that she told him to "go and do that," to which Garcia replied, "I didn't say that day or anything."   At another point in the video, Investigator Alvarez testified that Gomez appeared to mouth the words "*ella fue*," into the surveillance camera, which translated from Spanish to English means "it was her."

Hidalgo County medical examiner, Norma Jean Farley, M.D., also testified.   After autopsying Tony's body, Dr. Farley opined that the causes of Tony's death were gunshot wounds to his head and the left-side of his chest.   According to Dr. Farley, three gunshot wounds were found.   The first entered and exited out Tony's right forearm, re-entered his body through his right face, and ultimately struck his brain stem.   The second was a wound to the left-side of his chest, and the third was a shot to the back of his head.   On cross-examination, Dr. Farley noted that she did not find what she called "powder tattooing" on Tony's body, which would have indicated a close-range shot.

Several witnesses also testified about the evidence collected during the police investigation.   Police recovered a 9-millimeter Beretta firearm in a pile of caliche sand located in the rear of the CIW yard.   According to Texas Department of Public Safety (DPS) forensic scientist Nicole Hahn, no DNA was obtained from the Berretta due to its

---

[3] Both English and Spanish were spoken during the video.   The court's interpreter translated the Spanish portions at trial.

exposure to the elements. DPS forensic scientist Meghan Blackburn also testified that "no suitable fingerprints" were developed on any of the items submitted to them for testing, including the 9-mm Beretta. However, Richard Hitchcox, a forensic firearm and tool marks expert with DPS, opined that the evidence suggests that the three bullets and jackets found at the crime scene and inside Tony's body were fired from the 9-mm Beretta. Hitchcox testified that while he did not have any opinion as to who fired the gun, he believed that the trigger person was likely someone who was inexperienced with using the firearm in light of the unfired ammunition found on the floor of the crime scene. Hitchcox attributed this anomaly to a trigger person who unintentionally ejected the bullets by pulling back the slide of the firearm while having the safety engaged.

Thomas White, a forensic chemist with DPS in Austin, testified that he analyzed Garcia's gunshot residue test and clothing collected by the Edinburg police. According to White, the gunshot residue test showed nothing to implicate Garcia. White testified that a negative finding on a gunshot residue test can be caused by several things including that the subject did not fire a weapon. White testified that he did, however, find some gunshot residue on the tail of Garcia's sweater, but he did not know whether the residue was found on the front or back of the sweater because he swabbed the entire sweater for the test.

After a seven-day trial, the jury found Garcia guilty of murder and assessed punishment at fifty-five years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. This appeal ensued.

## II.     CONFRONTATION CLAUSE

By her first issue, Garcia asserts that the trial court violated her right to confrontation by admitting the December 12, 2008 videotaped conversation between Gomez and herself.

## A.     Applicable Law and Standard of Review

Under the United States and Texas constitutions, an accused has the right "to be confronted with the witnesses against her" in a criminal prosecution.    *See* U.S. CONST. amend VI; TEX. CONST. art. I, § 10.    This framework provides that "testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."    *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).    As a threshold matter, the confrontation clause applies to "witnesses" against accused—that is, those who "bear testimony." *Crawford*, 541 U.S. at 51.    "Testimony" is typically "'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)).

Various forms of "testimonial statements" are recognized under *Crawford*. These include:  (1) ex-parte in-court testimony or its functional equivalent that is, materials such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pre-trial statements that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) statements that were made under circumstances which would lead

9

an objective witness to reasonably believe that the statement would be available for use at a later trial. *See id.* at 51–52. Statements taken by police in the course of interrogations are also testimonial. *Id.* at 52. A statement need not be sworn, and the absence of an oath is not dispositive as to whether the statement is testimonial. *Id.*

While we defer to a trial court's determination of historical facts and credibility in our review, we review whether a statement is testimonial de novo. *See Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006) (highlighting the *Crawford* standard of "an objectively reasonable declarant standing in the shoes of the actual declarant"). If a statement is determined to be testimonial, the Sixth Amendment further requires that the declarant be unavailable to testify, and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 54 (holding that historical sources suggest that that a prior opportunity to cross-examine was a dispositive requirement under the Sixth Amendment).

**B.      Discussion**

Garcia argues that the December 12, 2008 videotaped interaction between Gomez and her, after they were both arraigned, included testimonial statements and was offered by the State at trial in violation of Garcia's right to confrontation. To support this argument, Garcia directs us to two cases in which Confrontation Clause error was found that bears "striking resemblance" to the present statements.

The first, *Lee v. Illinois*, involved the prosecution's use of a codefendant's confession to police as substantive evidence against Lee in a murder trial. 476 U.S. 530 (1986). The U.S. Supreme Court held that a codefendant's confession inculpating the accused is inherently unreliable, and the use of such confession by the prosecution

to establish Lee's guilt violated her Sixth Amendment right to confrontation. *Id.* at 546. The second, *Rubio v. State*, 241 S.W.3d 1, involved the admission of three statements to police by Rubio's common-law wife and accomplice to the murders for which Rubio was being tried. (Tex. Crim. App. 2007) The court of criminal appeals concluded that the accomplice statements were undisputedly "testimonial" under *Crawford* because they stemmed from police interrogations and were, thus, erroneously admitted. *See id.* at 3.

We find both of these cases substantially distinguishable. One noticeable factor present in both *Lee* and *Rubio* and absent from the present case is the role of the police. In *Lee* and *Rubio*, statements and/or confessions were given directly to a government actor, i.e. the police, in a manner that indicates "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *See Crawford*, 541 U.S. at 59. Additionally, *Crawford* and *Rubio* made clear that statements given during a police interrogation are "testimonial under even a narrow standard." *Id.* at 52; *Rubio*, 241 S.W.3d at 3.

In this case, a video recording was made of a conversation between Garcia and Gomez, after arraignment, with no police examination as described in *Crawford*. *See Crawford*, 541 U.S. at 52 (comparing police interrogations to the historic English civil-law practice of examinations by justices of the peace which the Confrontation Clause sought to remedy). Garcia asserts that we should nonetheless apply *Crawford* because the videotape was "made in a law enforcement setting, under the control of law enforcement, being listened-to, recorded, and interpreted by law enforcement." We find Garcia's argument unsupported by *Crawford* or its progeny. We also decline the implicit invitation to extend the interpretation of "testimonial" statements beyond the principles

11

articulated in *Crawford*.   *See De La Paz*, 273 S.W.3d at 680 ("whether a statement may be testimonial if made, as in this case, to a non-government employee has not yet been resolved by the Supreme Court").

Garcia also argues that the videotaped conversation "squarely placed blame for the murder upon Garcia who had absolutely no opportunity to confront Gomez and question him about his 'testimony.'"  We, again, disagree.   Several portions of the video show Garcia engaged in conversation with Gomez about her involvement with the case.   In these conversations, she denied shooting her husband, but she also incriminated herself.

Accordingly, we conclude that the videotaped conversation between Garcia and Gomez was non-testimonial, and the trial did not err by admitting it.   Garcia's first issue is overruled.

### III.   DECEMBER 11, 2008 STATEMENT

By her second issue, Garcia asserts that the trial court erroneously denied her motion to suppress her December 11, 2008 statement because it violated her constitutional protections against self-incrimination.

### A.   Standard of Review and Applicable Law

"A trial court's ruling on a motion to suppress, like any other ruling on the admission of evidence, is subject to review on appeal for abuse of discretion."   *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009).   In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling.   *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).   We review a trial court's ruling on a motion to suppress evidence

under a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). In this bifurcated review, we do not engage in our own factual review; rather, the trial judge is the sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony. *Id.* Trial courts are given almost complete deference in determining historical facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We conduct a de novo review of evidence when the resolution of mixed questions of law and fact do not turn on an evaluation of credibility and demeanor. *St. George*, 237 S.W.3d at 725.

No statement, either oral or written, of an accused made as the result of a custodial interrogation shall be admissible against the accused in a criminal proceeding, unless the accused, prior to making the statement, voluntarily waives rights pursuant to the following warning that:

(1) she has the right to remain silent and not make any statement at all and that any statement she makes may be used against her at her trial;

(2) any statement she makes may be used as evidence against him in court;

(3) she has the right to have a lawyer present to advise her prior to and during any questioning;

(4) if she is unable to employ a lawyer, she has the right to have a lawyer appointed to advise her prior to and during any questioning; and

(5) she has the right to terminate the interview at any time.

*See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2; 3 (West 2005); *see generally Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966).

13

**B.     Discussion**

A motion to suppress does not automatically shift the burden onto the State to show compliance with *Miranda* and the article 38.22 warnings unless and until the defendant first proves that the statements she wishes to exclude were the product of custodial interrogation. *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (quoting *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005)). Therefore, the State has no burden at all unless the record as a whole clearly establishes that the defendant's statement was the product of custodial interrogation by an agent for law enforcement. *Wilkerson*, 173 S.W.3d at 532. A trial court's ultimate "custody" determination presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526.

Under *Miranda*, "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995). The initial determination of "custody" depends on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the persons being questioned. *Stansbury v. California*, 511 U.S. 318, 323 (1994).

Garcia concedes that when she first arrived at the Edinburg police station on December 11, 2008, she was not in custody; however, Garcia argues that she was "in custody" for purposes of article 38.22 and *Miranda* at the time she admitted to being present when her husband was murdered. Garcia argues that the totality of the circumstances—that is, (1) her failed polygraph administered earlier that day; (2) the length of interrogation; (3) Garcia's changing of stories; (4) the tricks used to induce a

14

confession; (5) the mentioning of Garcia's purported prior solicitation of murder from Cortina; (6) an available six-figure life-insurance policy in Tony's name; and (7) the unfired bullets that were found at the crime scene—would lead a reasonable person to believe that they were not free to leave after admitting to being at the murder scene. We disagree.

It is the "compulsive aspect" of custodial interrogation, and not the strength or content of the government's suspicions at the time of questioning, which imposes *Miranda* safeguards during custodial interrogation. *Stansbury*, 511 U.S. at 323 (citing *Beckwith v. United States*, 425 U.S. 341, 346–47 (1976)). The record does not show how her admission that she was present at the time of Tony's murder was the product of custodial interrogation, or that she was deprived of her freedom of action in any significant way. *See Thompson*, 516 U.S. at 107. To the contrary, the record shows that Garcia: (1) showed up to the police station on December 11, 2008 voluntarily; (2) was not placed under arrest or formally handcuffed; and (3) Investigator Alvarez testified that he understood that Garcia believed that she was free to go after she received phone calls during the interview and told people that she was "OK" and would "be out [of the interview] in a minute."

Next, Garcia argues that police employed the two-step "question first, warn later" routine in order to circumvent her *Miranda* protections. We disagree. The "question first, warn later" principle was articulated by the court of criminal appeals in *Carter v. State*, 309 S.W.3d 31 (Tex. Crim. App. 2010). Essentially, under this technique, police deliberately withhold *Miranda* warnings until an accused confesses, then administer *Miranda* warnings "midstream" and ask the accused to repeat the earlier unwarned

15

confession. *See id.* at 36–37 (citing *Missouri v. Seibert*, 542 U.S. 600, 614–17 (2004)). We review challenges to the deliberate "question first, warn later" technique for clear error, and will give due deference to the trial court on appeal to factual findings regarding the officer's credibility. *See Carter*, 309 S.W.3d at 39–40; *McCulley v. State*, 352 S.W.3d 107, 118 (Tex. App.—Fort Worth 2011, pet. ref'd).

Garcia relies on the following exchange from her December 11, 2008 statement, after she was given her *Miranda*/article 38.22 warnings, to support her argument:

| | |
|---|---|
| GARCIA: | Okay. What I want to explain is like right now if I am here voluntarily, can I just leave? And then what—I want to continue helping, but my daughters right now are just like super worried. I just want to go home and—and—and—I don't—and tell them a little bit of this so they can start understanding and stop being so worried and be back tomorrow or something. |
| | . . . . |
| INVESTIGATOR ALVAREZ: | You are still here voluntarily. I would like to understand if you understand these rights— |
| GARCIA: | Well, some. |
| INVESTIGATOR ALVAREZ: | —so I can ask—which ones do you not understand? |
| GARCIA: | I just don't know if I—once I sign, that's it, I cannot go home? |
| INVESTIGATOR ALVAREZ: | This is—this—signing this has nothing to do with going home, nothing, nothing to do with it whatsoever. This is just on the record that you understand what your rights are. That's all it is. It's got nothing to do with home. If you sign it, |

16

| | |
|---|---|
| | you know, you can go home. If you don't sign it, you can go home. |
| GARCIA: | Even if I sign it, I can go home to them? |
| INVESTIGATOR ALVAREZ: | Oh, yes. Yeah. |
| GARCIA: | Okay. |

Based on our review, the trial court found Investigator Alvarez's testimony credible that Garcia voluntarily gave her initial unwarned statement to police. The record substantiates this finding. The evidence shows that despite Garcia's reservations and purported misunderstanding of her rights before giving her second warned statement, Investigator Alvarez made it clear to Garcia that she did not need to waive her rights that day and was free to go home. Accordingly, we conclude that the trial court did not err in admitting Garcia's post-*Miranda* statement. *See McCulley*, 352 S.W.3d at 119.

Garcia next argues that police violated Garcia's *Miranda*/article 38.22 right to silence and right to terminate the interrogation after she told police in the previously-referenced exchange that she wanted to go home and come back the next day. The threshold inquiry is whether Garcia invoked her right to silence. *See Williams v. State*, 257 S.W.3d 426, 432 (Tex. App.—Austin 2008, pet. ref'd). A police officer does not violate a suspect's right to remain silent when the officer attempts to clarify whether the suspect wishes to remain silent, and the suspect thereafter chooses to continue to speak about the offense. *Id.* at 432–33. The right to silence must be unambiguously invoked, and we must look to the totality of the circumstances in our review. *See Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996); *Williams*, 257 S.W.3d at 433; *see also Berghuis v. Thompkins*, 130 S.Ct. 2250, 2262–63 (2010)

17

(explaining that a defendant could have said nothing or unambiguously invoked his *Miranda* rights and ended the interrogation, but, instead, chose to answer a detective's question).

Here, Garcia invoked her right to silence, if at all, in an ambiguous manner—that is, by first, stating that she wanted to continue helping the police, but second, stating that she wanted to go home. Accordingly, Investigator Alvarez did not violate Garcia's purported invocation of silence because he attempted to clarify whether she did in fact wish to remain silent. However, Garcia chose to continue to speak about Tony's murder. *See Williams*, 257 S.W.3d at 432–33.

We also disagree with Garcia's last argument that she was coerced or enticed into making incriminating statements because Investigator Alvarez used "extrinsic pressures" by telling her that her daughters would find out about her extramarital affairs and prior solicitation to kill Tony moments before she admitted to being present at the crime scene. Whether a defendant's statement was coerced, and not voluntary, turns upon whether the defendant's will was overborne at the time she confessed. *See Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). In this case, even after Investigator Alvarez mentioned the fact that Garcia's daughters would find out about her extra-marital affairs and alleged prior murder solicitation of Tony, Garcia continued to deny that she murdered Tony. Through the interrogation, however, Garcia slowly changed her story. We conclude that: (1) Garcia's statement was voluntarily given and not coerced; and (2) the trial court did not err in denying Garcia's motion to suppress.

Garcia's second issue is overruled.

18

## IV. SUFFICIENCY REVIEW

By her third issue, Garcia contends that the evidence was legally insufficient to sustain a conviction for murder.

### A. Standard of Review

We apply the standard articulated in *Jackson v. Virginia* to determine whether the evidence is sufficient to support a criminal conviction. 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (holding that the *Jackson* standard of review is the "only standard" that should be applied in a sufficiency review). Under *Jackson*, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

The elements of the offense are measured as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App.1997)). Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal*, 286 S.W.3d at 327.

We defer to the jury's determinations of credibility and weight to be given to the evidence because jurors are the sole fact-finders. *See Brooks*, 323 S.W.3d at 899; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony. . . ."). Each fact need not point directly and independently to the guilt of Garcia, as long as the

cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (2007). Specifically, to determine whether an individual is a party to an offense, we look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012); *see Hooper*, 214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, or party status, and circumstantial evidence alone can be sufficient to establish guilt. *See Gross*, 380 S.W.3d at 186; *Hooper*, 214 S.W.3d at 13.

**B. Discussion**

The State indicted Garcia on one count of murder. At trial, the State argued two possible theories of liability: first, that she was the principal actor in Tony's murder; or second, that she was a party to Tony's murder with Gomez. *See* TEX. PENAL CODE ANN. § 7.01(a) (West 2011) ("A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both").

Under a hypothetically jury charge authorized by the indictment in this case, Garcia is guilty of murder if she: (1) intentionally or knowingly (2) caused the death of Antonio "Tony" M. Garcia, *see* TEX. PENAL CODE ANN. § 19.02(b)(1); or (1) acting with intent to promote or assist the murder, (2) Garcia solicited, encouraged, directed, aided, or attempted to aid Gomez (3) to intentionally or knowingly cause the death of Antonio "Tony" M. Garcia. *See id.* § 7.02(a)(2) (West 2011).

20

We agree with Garcia that legally insufficient evidence exists to sustain her conviction as the principal in Tony's murder. Despite twice changing her story to police over three separate interrogations, the record shows that Garcia eventually admitted to being at the scene, but continuously, consistently, and sometimes strenuously, maintained to the police, as well as in her conversation with Gomez, that she was not the shooter. Also, never at any point during the December 12, 2008 videotaped conversation does Gomez identify Garcia as Tony's shooter. Furthermore, none of the evidence collected by the Edinburg police identified Garcia as the shooter. The State produced one positive gunshot residue test on the tail of Garcia's sweater, but the State could not pinpoint the exact location of where the residue was found on the sweater. After examining this evidence in the light most favorable to the verdict, we cannot conclude that a rational trier of fact could have found the essential elements of Garcia as the principal actor to the murder beyond a reasonable doubt.

However, we disagree with Garcia that the evidence is insufficient to sustain her conviction as a party to Tony's murder. In her December 11, 2008 statement, Garcia admitted that she was present at the time of Tony's murder. However, we recognize that "mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross*, 380 S.W.3d at 186.

The State offered significant circumstantial evidence to support its theory that Garcia was a party to the murder. First, Garcia changed her story twice, before ultimately identifying Gomez as the shooter. Second, the State offered the testimony of Garcia's ex-lover, Cortina, who stated that during their affair, Garcia always wished Tony

dead and "probably" wanted him to look for someone to kill Tony, but he never followed through. Third, Investigator Alvarez testified that during his investigation of Tony's murder, he found it odd that he received several telephone calls from Tony's family members inquiring about the status of the case, but he never received status phone calls from Garcia. Finally, the State produced the videotaped conversation between Garcia and Gomez, in which several incriminating statements were made, including Gomez telling Garcia that had she not left him the key, "nothing would have happened," "but you were in a hurry." In the video, Gomez also told Garcia that he wanted to wait to do it, but she told him to "go and do that," to which Garcia replied, "I didn't say that day or anything." At no time during this conversation did Garcia refute or deny Gomez's statements to her, she only denied being the shooter. After examining this evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Garcia was guilty of murder as a party.

Garcia's third issue is overruled.

## V. ACCOMPLICE-WITNESS JURY INSTRUCTION

By her final issue, Garcia asserts that the trial court erred by denying her request for a jury instruction on accomplice witness corroboration.

### A. Standard of Review and Applicable Law

Our first duty in analyzing a jury-charge issue is to determine whether error exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If we find error, we analyze it for harm. *Id.* The degree of harm necessary for reversal depends on whether the error was preserved by objection. *Id.* If the error was preserved by objection, we will reverse if we find "some harm" to the defendant's rights. *Id.* If no

22

objection was made, we will reverse only if the record shows "egregious harm" to the defendant. *Id.*

A defendant has a right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006); *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). The purpose behind this rule is to ensure that the jury, and not the judge, decides the credibility of the evidence. *See Cocke*, 201 S.W.3d at 747.

In Texas, a conviction cannot be secured upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant to the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *Cocke*, 201 S.W.3d at 747. The relevant instruction merely informs the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (en banc).

## B. Discussion

Garcia argues that because Gomez was an accomplice to the crime charged, his videotaped out-of-court statements entitled her to an accomplice-witness instruction. We disagree. A key requirement under article 38.14 is that the accomplice serves as a witness—that is, one who bears testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Bingham v. State*, 913 S.W.2d 208, 210 (Tex. Crim. App. 1995) (noting that "testimony," in the context of article 38.14, is "evidence given by a competent witness under oath or affirmation; as distinguished from evidence derived from writings, and other sources."). We held in Part II of this opinion that Gomez's out-of-court videotaped statements did not

23

constitute testimony and apply that same reasoning here. Therefore, the trial court did not err in denying Garcia's request for an accomplice-witness instruction. Garcia's fourth issue is overruled.

## VI. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
14th day of March, 2013.